Lawrence A. WILD, Petitioner,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Respondent.

No. 81–2542.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1982.

Decided Nov. 12, 1982.

Rehearing and Rehearing En Banc Denied Jan. 26, 1983.

Robert A. Filpi, Stack & Filpi, Chicago, Ill., for petitioner.

William T. Clabault, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for respondent.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and DECKER,* Senior District Judge.

POSNER, Circuit Judge.

The following facts are either uncontested, or were found by the Merit Systems Protection Board and are supported by substantial evidence. Lawrence A. Wild was for many years employed by the U.S. Department of Housing and Urban Development in Chicago as an appraiser. In 1976 his wife purchased, for $28,500, two six-flat apartment buildings in a poor neighborhood of Chicago. He assisted in the purchase

* Of the Northern District of Illinois.

and became the manager of the buildings. At the time of purchase all of the apartments were fully rented, but within a very short space of time the tenants began moving out because of harassment by a gang known as the "Insane Unknowns," and because the buildings were deteriorating physically. Within a year the buildings had fallen into serious disrepair, had no tenants at all, and were being used by the gang for narcotics trafficking. A group fighting to save the neighborhood took steps, which included filing complaints with the City of Chicago and complaining in person and in writing to Wild's superiors at HUD, to pressure Wild to rehabilitate the buildings. Beginning in February 1978 Wild's superiors tried to persuade him to either rehabilitate or get rid of the buildings. He made repeated promises to do so that he did not keep, and efforts that were half-hearted and ineffectual. His superiors threatened to discharge him for violation of HUD's code of conduct. In January 1979 an article on Wild's troubles appeared in the *Chicago Sun-Times,* under the title "HUD Employee Told to Repair Buildings." He still temporized and on April 24 the housing court ordered the buildings demolished. A month later Wild was fired for having (1) violated the code of basic principles governing the conduct of HUD employees, (2) violated HUD's financial conflict of interest regulations, and (3) falsified a financial disclosure statement. He appealed to the Merit Systems Protection Board, which, after a full evidentiary hearing, threw out the last two charges as unproved but upheld the third and affirmed his discharge. Wild has petitioned this court under 5 U.S.C. § 7703(b)(1) for review of the Board's determination.

We can dispose quickly of several of Wild's grounds for reversing the Board. He claims that he was discriminated against on account of his marital status—which the Civil Service Reform Act of 1978 makes a forbidden basis for adverse personnel action, see 5 U.S.C. § 2302(b)(1)(E)—because he was punished for his wife's ownership of

slum properties. But as the Board found on ample evidence, he managed the properties and was fired because of what he did, or rather failed to do, as manager.

We also reject Wild's argument that the code of conduct does not authorize adverse personnel action. The evident purpose of the code is to make conduct that is not necessarily forbidden by any express regulation a ground for separating an employee from HUD. It states that a HUD employee "can never have a right of tenure that transcends [*sic*] the public good. He can properly be a Government employee only as long as it remains in the public interest for him to be one. Public trust and confidence in the integrity of the Government are paramount." 24 C.F.R. § 0.735–201(a). In addition, "the effective accomplishment of the Department's mission is significantly dependent upon a public image that engenders confidence in the Department's integrity. Accordingly, the avoidance of any involvement that tends to damage that image is a responsibility of exceptional importance for all employees who participate in or influence official operating determinations that affect the interests of those with whom the Department does business." 24 C.F.R. § 0.735–201(b)(1). Therefore, "If there is knowledge of an employee's involvement in or association with circumstances reasonably construed to reduce public confidence in the acts or determinations of the Department, such knowledge may be sufficient cause for the initiation of action adverse to the employee" 24 C.F.R. § 0.735–201(b)(2).

Wild makes the distinct but related argument that the code is too vague to provide adequate notice that his off-duty conduct placed his job on the line. We do not condone the draftsmen's sloppy use of the English language—especially the mayhem committed on the word "transcend"—but, redundant and heavy-handed and bureaucratic as it is, the code adequately conveys its concern that an employee not conduct himself in a way likely to bring public obloquy upon HUD. Wild was employed by HUD as an appraiser, a responsible professional position, but moonlighting as the manager of his wife's slum property let it deteriorate so badly that it became a focus of criminal activity—a true neighborhood blight—and it was eventually ordered to be demolished. The irony of a professional employee of HUD, the federal agency whose most important or at least best known mission is to eradicate slum housing, being hauled into court for letting the slum property of which he was sole manager and in effect absentee landlord deteriorate so badly that it was ordered to be demolished did not escape newspaper comment.

We cannot imagine a better example of the sort of episode that the code was designed to prevent. But even if the code is vaguer than we think, this would not help Wild, because his superiors warned him for more than a year before actually discharging him that he was violating the code. True, he and his wife might have lost money if he had gotten rid of or rehabilitated the property on the timetable set by his superiors (though as it turned out the housing court's order that the buildings be demolished was issued before HUD got around to firing him); but as soon as the property began to deteriorate late in 1976, Wild should have had more than an inkling that his extracurricular activities in real estate could jeopardize his job. Two years of explicit warnings is a sufficient grace period.

The most substantial ground on which Wild challenges the lawfulness of his discharge is that HUD's code of conduct, as applied to the facts of this case, is inconsistent with the laws protecting the tenure of federal civil servants.

The problem of the public employee whose private conduct mocks the mission of the agency that employs him is not a new one; and until 1978, when the Civil Service Reform Act was passed, it was clear that such conduct was a lawful basis for firing the employee. For example, in *Wroblaski v. Hampton*, 528 F.2d 852 (7th Cir. 1976) (per curiam), this court upheld the discharge of an employee of the Immigration and Naturalization Service for employing

illegal aliens in her home; and in *Masino v. United States,* 589 F.2d 1048 (Ct.Cl.1978), the Court of Claims upheld the discharge of a customs officer who used marijuana—one of the substances he was supposed to keep out of this country—albeit off duty.

■ These cases arose under 5 U.S.C. § 7513(a), which provides that the discharge of a federal employee on grounds of misconduct may "only [be] for such cause as will promote the efficiency of the [federal civil] service." The Civil Service Reform Act of 1978, while it did not amend section 7513(a), added two provisions which, Wild argues, qualify it. One, 5 U.S.C. § 7703(c)(3), requires that discharges for cause be supported by substantial evidence; before 1978 they only had to have a rational basis, see *Wroblaski, supra,* 528 F.2d at 853. But a change in evidentiary requirements should not affect the outcome of cases where the issues are not evidentiary. In *Wroblaski* and *Masino,* as in this case, the question was not whether the employee had engaged in the alleged misconduct, a question that might be answered differently under a substantial evidence standard than under a rational basis standard, but whether the misconduct was of a character likely to undermine public confidence in the agency, and thus impair the agency's efficiency, although it might not affect the employee's job performance. It is unlikely that a change in the standard of judicial review was intended to change the answer to that question.

■ The second provision, 5 U.S.C. § 2302(b)(10), forbids federal agencies to "discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others," unless the employee or applicant has been convicted of a crime, as Wild has not been. At first glance this provision may seem to forbid agencies to fire employees for any misconduct committed while off duty, but a closer reading suggests that no such drastic change in existing law, as illustrated by *Wroblaski* and *Masino,* was intended. The

reference to "performance by others," presumably the employee's co-workers, would seem to allow discharge where an employee's off-duty conduct impairs the efficiency of the agency by undermining public confidence in it, thereby making it harder for the agency's other employees to perform their jobs effectively. This provision, the draftsmen's use of the pejorative term "discriminate" to denote the forbidden conduct, and the fact that the other subsections of section 2302(b) specifying impermissible grounds for discharge involve grounds that the draftsmen obviously regarded as invidious, such as race, age, and marital or political affiliation, see 5 U.S.C. §§ 2302(b)(1)(A)–(E), suggest that section 2302(b)(10) should be read to prevent agencies from using the threat of discharge to deter unrelated off-duty behavior of federal employees, but not to prevent them from using such threats to deter off-duty behavior directly related to the agency's work.

The cases Wild relies on, such as *Bonet v. United States Postal Serv.,* 661 F.2d 1071 (5th Cir. 1981), involve off-duty sexual behavior of federal employees whose official duties do not involve sex, or off-duty narcotics use by federal employees whose official duties (unlike Masino's) do not involve narcotics. In contrast, *Wroblaski, Masino,* and the present case involve off-duty misconduct that undermines the mission of the agency. *Bonet* recognizes this difference, see 661 F.2d at 1078, and cites with approval *Hoover v. United States,* 513 F.2d 603 (Ct.Cl.1975). That was a case much like *Wroblaski, Masino,* and the present case. An officer of the Internal Revenue Service had falsified his own tax returns, and the court held that this was a lawful ground for firing him.

Our suggested interpretation of section 2302(b)(10) may not be inevitable as a textual matter, but considerations of legislative purpose reinforce it. The Civil Service Reform Act of 1978 was the culmination of a long effort to make the federal civil service more efficient and businesslike, and less political, see S.Rep. No. 969, 95th Cong., 2d Sess. 2–4 (1978), U.S.Code Cong. & Ad-

min.News 1978, p. 2723—more, that is, like the work forces of (enlightened) private employers. A private employer would think twice about firing a valued employee who had been, say, arrested for homosexual activity while off duty. Assuming the employer was not a junior high school, or a defense contractor, or some other kind of enterprise likely to lose customers if it was known to employ homosexuals in certain positions, firing such an employee would reduce the efficiency and hence profitability of the business, and might even endanger its survival if it was in a highly competitive market. But government agencies not only do not face the market constraints that private businesses do, they are subject to political constraints of a sort that private businesses are not, and for both reasons are more likely than private businesses to bow to public hostility to deviant or unorthodox private behavior. Cf. Alchian & Kessel, *Competition, Monopoly, and the Pursuit of Money*, in Aspects of Labor Economics 157 (Natl.Bur.Econ.Research 1962). To the extent that they do so and make decisions not motivated by the interests of the agency, they reduce the efficiency of the civil service; and it was to prevent this from happening that, we think, section 2302(b)(10) was enacted.

■ But where an employee's off-duty behavior is blatantly inconsistent with the mission of the employer and is known or likely to become known, most any employer, public or private, however broadminded, would want to fire the employee and would be reasonable in wanting to do so; and we find no evidence that Congress intended to deny this right to federal agencies. If an employee of a manufacturer of safes moonlighted as a safe cracker, his days as an employee of that manufacturer would be numbered, even if he scrupulously avoided cracking safes manufactured by his employer. If an officer of a musicians' union owned a nightclub that employed non-union musicians, because their wages were lower, his days as an employee of the union would be numbered. A customs officer caught smuggling, an immigration officer caught employing illegal aliens, an IRS employee who files false income tax returns, a HUD appraiser moonlighting as a "slumlord"—these are merely the public counterparts of a form of conflict of interest that is not less serious for not being financial, that would not be tolerated in the private sector, and that we do not believe Congress meant to sanctify in the public sector.

■ It may be replied that all Wild is asking is that the agency be forced to *prove* a reduction of its efficiency due to off-duty misconduct, rather than being allowed to infer it from the relation between the misconduct and the agency's mission. But proof of that relation *is* the substantial evidence that the statute requires; to require more proof would be unnecessary and unrealistic. Without judicial precedent, without persuasive evidence of congressional intent, and in the face of our own contrary precedent in *Wroblaski,* we will not force HUD to continue employing a "slumlord" in a responsible position until it can prove, by the cumbersome methods of litigation, what ought to be obvious—that the credibility and effectiveness of the department are undermined by such discordance between public duty and private conduct.

We have said it is obvious; but that does not mean it would be easy to prove. HUD is a vast organization. To prove by the methods of litigation that anything which a nonsupervisory employee did would impair the efficiency of the organization would be a daunting task, and one that would rarely be worth undertaking to remove a single employee. If Mr. Wild were the biggest slumlord in Chicago, it still would be extremely difficult to demonstrate in an adjudicative proceeding that his removal from HUD was necessary to secure the efficient functioning of the agency. We do not think it was the purpose of the Civil Service Reform Act to make it impossible as a practical matter to get rid of a civil servant whose off-duty conduct is in direct conflict with the mission of the agency that employs him. We think the focus of the protective provisions on which Wild relies is on off-duty conduct that may offend a supervisor

or even the public but that is irrelevant to the agency's mission.

Running through Wild's brief is the suggestion that he is being punished for conditions beyond his control. Of course Wild did not want the buildings to be a roost for hooligans. But he was not terminated in 1976 when they first began to deteriorate. He was not terminated until two and a half years later, long after the bottom had been reached. And he was terminated not because the buildings had deteriorated but because he, who had sole responsibility for their management, did nothing to arrest the deterioration or get rid of the properties, though given literally years to do so.

■ One issue remains to be considered. As noted earlier, HUD fired Wild on the basis of three charges, two of which—the two most serious—the Board threw out. One might have expected that having thrown out the most serious charges, the Board, rather than upholding Wild's dismissal as it did, would have remanded the case to HUD to see whether HUD really wanted to fire Wild rather than impose some lesser sanction for the only charge that was sustained. Such a remand would not have been necessary if HUD had indicated in dismissing Wild that the sanction would be the same whether all or any or the charges were sustained—if it had, as it were, imposed a separate sentence on each count. But because HUD did not do this it became necessary for the Board—whose function is to review, rather than order, the dismissal of federal employees—to remand the matter to the agency for a redetermination of the penalty.

Any doubt that this is the right course is dispelled by the only statement the Board's hearing examiner made on the question of sanctions: "the sustained reason may well constitute a basis for a finding that the action was taken from such cause as will promote the efficiency of the service." It may well, but the question is whether HUD would have fired Wild on the basis of just the one charge that was sustained, which happens as we have said to be the weakest of the three. On review of the examiner's decision the Board expressed the view that dismissal was not an unreasonable penalty for the charge that was sustained. The issue, however, is not whether the sanction is reasonable but whether HUD still wants to impose it now that the Board has thrown out the most serious charges against Wild. That issue requires a remand to HUD limited to the sanctions question.

Apparently Wild has actually been removed, notwithstanding the pendency of the review proceedings. Therefore, if HUD decides on remand that discharge was too harsh a sanction for the single charge that the Board upheld, he should be reinstated with back pay.

VACATED AND REMANDED.

DECKER, Senior District Judge, dissenting.

Because I believe that the remand ordered by the majority cannot be justified, either under the facts as found by the Merit Systems Protection Board or under the controlling law, I must respectfully dissent.

The foundation of Judge Posner's opinion is built upon the premise that appellant, as a "slumlord"[1] was guilty of such egregious

---

1. In using the term "slumlord" throughout his opinion, Judge Posner has added some individual color to the otherwise drab facts of this case. Given the majority's sensitivity to matters of public opinion, as manifested by its concern for HUD's public image, it cannot be unaware of the pejorative impact of this characterization of Wild's off-duty activities. The trier of the facts below made no reference to the appellant Wild as a slumlord. Indeed, the only appearance of the word "slumlord" in the findings below comes in an isolated quote from the discharging agency, which had itself placed the term in quotation marks. Moreover, the press, not known for restraint, made no use of the term "slumlord" in its one reference to the housing court proceedings. The trier of fact, eschewing pejorative labels, found no more than that Wild had, at worst, permitted his wife's buildings to deteriorate while under his management without taking steps to cause the buildings to be repaired or sold. Judge Posner also makes no mention of the fact that six weeks before the hearing examiner rendered his decision, one of the two buildings had not only not been demolished, but had four of its

conduct in his off-duty association with the two apartment buildings during the period in question that the image of HUD was seriously tarnished. Judge Posner then reaches his conclusion that the close connection between appellant's duties as an appraiser and the mission of HUD in itself provides the substantial evidence and nexus sufficient to justify his discharge. In reaching this conclusion, the majority makes no reference to the fact that in the record before the local MSPB official in this case, there was *no* evidence that Wild's off-duty conduct had an adverse effect on any HUD employee's performance of his job responsibilities. The record is also undisputed that Wild's own performance evaluations for 1977 and 1978, during the midst of his real estate activities, rated him above satisfactory or outstanding in all categories. There was no evidence, moreover, that the performance of any other HUD employee was affected in any way by Wild's off-duty conduct. The local official's decision upholding Wild's discharge was based solely on his conclusion that the housing court complaints against Wild's wife, the *Sun-Times* article, and the actions by WPNC were harmful to the department's public image.

The "presumption" relied on by HUD, and approved by this court, cannot substitute for the requirement of "substantial evidence."

In order for a federal employee's discharge to be based on publicity adverse to the agency, the government must establish not only that the publicity was in fact adverse, but also that the publicity was sufficiently adverse to impair the efficiency of the service. *Sherman v. Alexander,* 684 F.2d 464, 468 (7th Cir. 1982); *Bonet v. United States Postal Service,* 661 F.2d 1071, 1076 (5th Cir. 1981). In this case, the government offered no evidence linking the publicity concerning Wild to an adverse ef-

fect on the efficiency of the service. HUD offered no evidence to support a finding, for instance, that its dealings with the City of Chicago, the local business community, or the public at large were impaired by the news report of Wild's actions. Similarly, HUD offered no evidence that Wild's activities were known by the general public, except for a single newspaper account buried on page 26 of the *Chicago Sun-Times.* The local MSPB official's conclusions reflect the lack of any evidence linking the publicity to agency efficiency:

> "While the significant population of the metropolitan Chicago area tends to dilute the adverse impact, *if any,* of the media identification of the appellant as an agency employee and while *there is no specific showing that the agency's ability to carry out its mission was harmed in any way,* the agency presented evidence sufficient to show that, because of the appellant, a situation existed wherein the public image of the agency could suffer, notwithstanding the continued acceptable performance by the appellant."

R. 141 (emphasis supplied). Such a finding, that the employee's actions contributed to a "situation" in which the agency's image "could" suffer, hardly constitutes substantial evidence of a "vital link" between discharging the employee and promoting the efficiency of the service. *Young v. Hampton,* 568 F.2d 1253, 1261 (7th Cir. 1977). Mere transitory institutional discomfiture over an ·embarrassing newspaper story is not a sufficient basis for firing a federal employee. *Norton v. Macy,* 417 F.2d 1161, 1167 (D.C.Cir.1969).

This court's majority contends that "proof of [the] relation [between the misconduct and the agency's mission] *is* the substantial evidence that the statute requires; to require more proof is both unnecessary and unrealistic." [2] I cannot accept

---

six units ninety to one hundred percent rehabilitated, with two of these four occupied, which is inconsistent with the scenario that appellant continued to act as a slumlord after being warned by his superiors.

2. The majority insists that it is unnecessary to require HUD to produce evidence of what is logically "obvious"—that employing a slumlord impairs the efficiency of the agency. But where the governing statute demands "substantial evidence," that means *evidence,* not

the adoption by the Merit Systems Protection Board or by this court of a presumption that off-duty misconduct related to the agency's mission necessarily impairs the efficiency of the agency. Burdening the federal civil servant challenging a wrongful discharge with such a presumption violates his rights under the Civil Service Reform Act of 1978.

While, as the majority correctly observes, promoting business-like efficiency in government service was one purpose of the Civil Service Reform Act, it was by no means the exclusive one. Protecting the procedural and substantive rights of federal employees remained a core congressional concern. Thus, in the list of the objectives of his civil service reform proposals that President Carter sent to Congress, the first objective listed was: "To strengthen the protection of legitimate employee rights." President's Message to the Congress on Civil Service Reform, March 2, 1978, quoted in H.R.Rep. No. 1403, 95th Cong., 2d Sess. 3 (1978). The Senate Report, too, reflects the Act's multiple purposes: "One of the central tasks of the civil service reform bill is simple to express but difficult to achieve: Allow civil servants to be able to be hired and fired more easily, *but for the right reasons.*" S.Rep. No. 969, 95th Cong., 2d Sess. 4 (1978), U.S.Code Cong. & Admin. News 1978, p. 2726 (emphasis supplied).

Using a presumption such as that embraced by the majority to sustain adverse agency actions which are unsupported by evidence might be acceptable if the inquiry on appellate review was merely whether the action was arbitrary or lacked a rational basis. But, in enacting the 1978 Act, Congress decisively rejected application of such minimal levels of appellate scrutiny to adverse actions against employees for misconduct. In adopting, instead, the "substantial evidence" test, the Senate Committee stated:

"[T]he Committee felt that the agency should have to meet a heavier burden of proof when it sought to take an adverse action against an employee for misconduct than when the action was based on unacceptable performance. In the case of misconduct, the case is more susceptible to the normal kind of evidentiary proof, and the nature of the proceeding is more disciplinary in nature. . . .

"As under current law, the agency would continue to have the burden of . . . convincing the decision maker in the end that its action was lawful. There must be substantial evidence in the record supporting the agency action. In these two respects, S.2640 as reported differs from the original [Carter] bill, which placed the burden on the employee, and only required that the agency action not be arbitrary or capricious."

S.Rep. No. 969, 95th Cong., 2d Sess. 54–55 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2776–2777. Not only did the Senate enhance employee protections against unjust discharges by requiring substantial evidence, but the House added still more protection for civil servants like Wild by making it a "prohibited personnel practice" to "discriminate . . . against any employee on the basis of [non-criminal] conduct which does not adversely affect the performance of the employee . . . or the performance of others." 5 U.S.C. § 2302(b)(10). This is another indication that the burden of proof is to be on the agency to establish that an employee's off-duty conduct has harmed the agency.

Two recent decisions by other Courts of Appeals illustrate how Congress intended to allocate the burden of proof between an agency and its employee charged with misconduct. In *Hoska v. United States Department of the Army,* 677 F.2d 131 (D.C. Cir.1982), the court reversed an order of the Merit Systems Protection Board affirming the dismissal of a civilian employee of the Army based largely on evidence of incidents allegedly involving sexual misconduct or other indiscreet behavior while off-duty.

inferences, no matter how "obvious." "While logic can be helpful to supplement evidence or to draw inferences from evidence, it cannot

substitute for evidence." *Storer Broadcasting v. American Federation of Tel.,* 600 F.2d 45, 48 (6th Cir. 1979).

Relying in part on the prohibited personnel practice (§ 2302(b)(10), quoted above) added in 1978, the court, *id.* at 144 n. 22, held that where, as here, the employee's on-the-job performance was not in question, failure to prove the "nexus" between allegedly immoral off-duty conduct and the efficiency of the service was fatal, because

> "the rational nexus requirement is perhaps nowhere more important than where an adverse action is taken against an individual on the basis of lawful, consensual, social behavior that is considered by his superiors to be 'immoral' or 'notoriously disgraceful.' Without the limitations provided by the nexus requirement, such a standard would give the Army virtually free reign [sic] to purge itself of persons found to be distasteful under the sacrosanct guise of protecting the national security."

*Hoska,* 677 F.2d at 145. The "egregiousness" standard applied by the Merit Systems Protection Board and sustained by the decision of the majority bears a strong resemblance to the "notoriously disgraceful" standard condemned by the *Hoska* court, with relation to the mission of the agency substituted for national security as the justification.

In *Bonet v. United States Postal Service,* 661 F.2d 1071 (5th Cir. 1981), the court reversed the Merit Systems Protection Board's affirmance of the dismissal of a Postal Department employee, who was manager of a postal branch station, based on allegations of immoral and disgraceful off-duty sexual conduct[3] that had been publicized in a local newspaper. In an effort to show the required nexus between the discharged employee's conduct and the efficiency of the service, the Postal Service relied on its code of ethical conduct, which forbade "dishonest, notoriously disgraceful or immoral conduct, or other conduct preju-

dicial to the Postal Service." *Id.* at 1075. The court, relying on the protections for federal employees in the 1978 Act, firmly rejected use of any such "presumed or *per se* nexus":

> "The government maintains that a *per se* nexus is appropriate when the employee engages in conduct like that charged to Bonet. . . .
>
> "Despite our reflective revulsion for the type of off-duty misconduct in question, . . . the 1978 Act does not permit this court nor an employing agency to characterize off-duty conduct as so obnoxious as to show, *per se,* a nexus between it and the efficiency of the service. [Citations to statute omitted.] . . . .
>
> "These provisions clearly signal a legislative intent that the agency must demonstrate by sufficient evidence that the off-duty misconduct, upon which the disciplinary action is founded, adversely affects the performance of the duties of the employee or the agency. We further conclude, in light of the statutory requirements, that the reviewing authority may not place upon the employee, as the Board did, the burden of showing that his continued employment will *not* affect the efficiency of the service. The Board may not shift the burden of proof by presumption or application of the *per se* rule."

*Bonet,* 661 F.2d at 1077–78. The burden on the employee rejected in *Bonet* is precisely the burden placed on Wild and sustained by the majority. The Merit Systems Protection Board, in affirming Wild's dismissal, relied specifically on a finding that "[a]ppellant has not revealed any evidence to rebut the presumption that his conduct and the attendant adverse publicity, including the public's awareness of his affiliation with the agency, caused the agency to suffer a loss of public confidence in its ability to

---

**3.** The majority attempts to distinguish cases such as *Bonet* on the basis that they "involve off-duty sexual behavior of federal employees whose official duties do not involve sex," whereas housing is both the business of Wild's agency and the area of his alleged off-duty misconduct. While Wild's case may present a greater "irony," to use Judge Posner's phrase, postal employee Bonet's alleged misconduct (committing sexually indecent acts with a child) was just as sensitively related to the work of his department, which is, after all, one of the few federal agencies that sends its employees door-to-door among the homes in the community. Irony is no substitute for nexus.

accomplish its mission." R. 170. Not only is saddling a discharged employee with such a burden inconsistent with the statutory mandate, but the burden is one impossible to meet. What evidence could Wild possibly produce to prove that HUD did *not* suffer a loss of public confidence? Even if he had the resources to commission a poll on the question, he would have no corresponding data from the period before the publicity with which to compare his results.

The Department of Housing and Urban Development did not meet its burden of proof in this case, and the order of the Merit Systems Protection Board approving the appellant's discharge was in error and should be vacated.

The unusual disposition of this appeal is another reason for my dissent. The court purports to vacate the order of the Board upholding Wild's discharge and *remand* the case to HUD, "limited to the sanctions question." The Merit Systems Protection Board, in dismissing appellant's appeal, expressly held that the Presiding Official of the MSPB's Chicago Field Office was acting within his authority in upholding the sanction of dismissal after two of the three charges against appellant had been dismissed by the Presiding Official. It is most unlikely after this action by both the Presiding Official and the MSPB, and the strong views expressed by the majority approving the sanction of dismissal, that HUD would seriously consider a lesser action. Further, HUD can only reconsider the kind of sanction it wishes to impose on an individual who remains in HUD's employ. But, as the majority correctly observes, Wild is no longer in the employ of HUD. Since the court does not order HUD to reinstate Wild so as to be able to initiate new proceedings against him, if HUD should so choose, Mr. Wild is left in some kind of limbo, in which he has a theoretical right to have the nature of his punishment reassessed but only in the extremely unlikely event that HUD chooses to rehire him. It seems to me unfair to both Wild and HUD to dispose of this case in a manner, such as the majority has, which leaves both parties speculating as to just where they go from here. Wild,

in particular, is at least entitled to some final order on the merits of his discharge, without prolonging this litigation.

Having concluded that the record does not contain substantial evidence supporting the Board's decision that Wild's discharge promoted the efficiency of the service, I would remand the case to the Board to order appropriate relief, including reinstatement, back pay, and such other relief as may be warranted.