Office of the U.S. Atty., S.D.N.Y. by Franklin H. Stone, Asst. U.S. Atty., New York City, for defendant.

**Leroy STEWART, Omar Yusef and Rugilio Belgrave, Plaintiffs,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Defendant.**

**No. 83 Civ. 7322 (WK).**

United States District Court, S.D. New York.

July 31, 1984.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

Plaintiffs have brought this action pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., alleging that their employer, the United States Immigration and Naturalization Service ("INS") has discriminated against them on the basis of their color and national origin. Before us now is a motion by one of the plaintiffs, Leroy Stewart (hereinafter "plaintiff" or "Stewart") for a preliminary injunction to prevent defendant "from discriminating against the plaintiff, subjecting the plaintiff to retaliatory harassment, continuing plaintiff's indefinite suspension without pay, or otherwise affecting the plaintiff's employment status, and directing that plaintiff be restored to his position as an Immigration Inspector with full pay and benefits retroactive" to the date on which he was suspended without pay. Although the question is a close one, we believe that plaintiff is entitled to a temporary injunction granting part of the relief he requests,

he having shown (a) irreparable injury (b) serious questions going to the merits and suitable for litigation, and (c) a balance of hardships tipping decidedly in his favor.

## FACTUAL BACKGROUND

On November 25, 1980, Stewart and his co-plaintiffs filed an administrative complaint charging defendant with discrimination on the basis of color and national origin. On October 4, 1983, no action having been taken in the administrative proceeding, plaintiffs filed this lawsuit. According to Stewart, he had been warned that such action would earn him reprisals by defendant. He now alleges that action taken by defendant on May 26, 1984 was indeed such retaliation, and asks us to enjoin it.

On August 20, 1983 plaintiff was employed by defendant, as he had been for the previous eleven years. Plaintiff was required to wear a uniform while on the job, and was authorized—although not required—to carry a gun (which he did). On the night of August 20, 1983 plaintiff left work without removing either his uniform or his gun—neither of which he was required to remove—and proceeded to a friend's house. At approximately 10:00 p.m. he headed home, stopping on his way at a deli. On leaving the deli he noticed several youths taking drugs on the street. He approached them, reprimanded them for engaging in unlawful and socially destructive behavior, and told them to leave his neighborhood. He was rewarded for this civic-minded activity by being beaten and robbed by the youths, at least one of whom was armed. Picking himself up despite his wounds, plaintiff drew his gun, gave chase and fired at the youths who were by then approximately a block away, hitting one in the foot or leg. The youths then turned on plaintiff, again beating him and taking his gun. They remained on the scene and complained to the police, who arrived shortly. Plaintiff could not provide identification upon the officer's demand,

the youths having taken and still being in possession of his wallet; he was thereupon arrested and taken to the police station.

At the station plaintiff telephoned his immediate superior at the INS, Thomas Spellman, and requested that he come to identify him to the police—since he still had no identification—and to vouch for his good character and good work record, so that reasonable bail could be set. Spellman telephoned his own supervisor, James Jasey, who, according to plaintiff, told Spellman to "keep out of it." No identification or character support was given.

Eventually the matter was presented to a grand jury which was requested to return an indictment charging plaintiff with assault in the second degree and reckless endangerment in the first degree, both felonies. The grand jury refused this request and instead directed the filing of a prosecutor's information charging the misdemeanors of assault in the third degree and reckless endangerment in the second degree.[1] If convicted, plaintiff could be sentenced to a term of imprisonment.

On August 22, 1983, plaintiff was removed from his job and placed on "desk assignment." On May 26, 1984—after the commencement of this action—plaintiff was informed that he was suspended without pay until the disposition of the criminal charges. These charges are still pending against plaintiff; and he remains suspended, indefinitely to anyone's knowledge, without pay.

## IRREPARABLE INJURY

The injury claimed by plaintiff is not only the loss of his income during his suspension without pay (which money would ultimately be refunded to him in the event of his success on the merits of his discrimination claim). In addition, he has alleged disruption of his family life and an inability to provide for his wife and children.

---

1. Plaintiff claims that the District Attorney failed to advise the grand jury that his assailants—now his accusers—had long criminal records, while he was an officer of the INS with a virtually unblemished work history.

This seems to us an injury which is "irreparable" in the traditional sense of the word. The Government, however, contends that the Supreme Court in *Sampson v. Murray* (1974) 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166, establishes a peculiarly drastic standard for irreparable injury in all cases dealing with termination of employment, including Title VII and other civil rights actions. Although neither party has cited us to any relevant case in this Circuit or this District, we are aware that our Court of Appeals has recently rejected defendant's position in a Title VII case stating—albeit without reference to *Sampson*—that "in many cases the effect on the complainant of several months without work ... will constitute harm that cannot adequately be remedied by a later award of damages." *Sheehan v. Purolator Courier Corp.* (2d Cir.1981) 676 F.2d 877. One example of such a case given by another Judge in this District in a Title VII action is "the inability [of a plaintiff] to provide for his children," *Aguilar v. Baine Service Systems, Inc.* (S.D.N.Y.1982) 538 F.Supp. 581, 584—precisely the harm alleged by plaintiff here.

We have discovered, through our own research, one case in which our Court of Appeals has held that *Sampson* precludes a finding in a Title VII case of irreparable injury from mere loss of income. *Holt v. Continental Group, Inc.* (2d Cir.1983) 708 F.2d 87. Neither that nor any other opinion of our Court of Appeals of which we are aware, however, has actually analyzed the *Sampson* opinion or its applicability to Title VII cases.[2] We think that such an analysis would not in fact support defendant's position.

*Sampson* dealt with allegations of lack of procedural due process and discharge in violation of Civil Service regulations. No claim of discrimination, under Title VII or otherwise, was there invoked. Although the language of that case, relied upon by defendants, is admittedly broad, we note that Justice Rehnquist did not set forth a blanket rule that loss of income or reputation could not be the source of irreparable injury. Rather, he was at great pains to point out that the case before him involved Civil Service Regulations, but for which plaintiff—a probationary employee, unlike plaintiff here—could have been discharged with no showing of cause. The two references to the inadequacy of loss of income or reputation as a basis for a finding of irreparable injury, on which defendant heavily relies, both refer to "this type of case," 415 U.S. at 90, 92, 94 S.Ct. at 952, 953, which we think may fairly be taken to refer to the specific factual circumstances before the Court. This assumption, we think, is bolstered by the Court's reiteration of those circumstances in the very footnote relied upon by defendants:

> We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual. But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation. Use of the court's injunctive power, however, *when discharge of probationary employees is an issue,* should be reserved for that situation rather than employed in the routine case.

415 U.S. at 92, n. 68, 94 S.Ct. at 953, n. 68 (emphasis supplied).

The above-quoted language provides yet another reason why the holding of *Sampson* should not apply to Title VII cases where, as here, allegations are made that employment action was taken in retaliation for complaints of discrimination. In such a situation, it cannot be said that the injury—removal of plaintiff from his position without pay, as in the situation at bar—is an "external factor common to most discharged employees and not attributable to any unusual actions relating to the dis-

---

**2.** The sole discussion of the purpose and meaning of *Sampson* in a case decided by our Court of Appeals, so far as we know, is found in Judge Markey's dissenting opinion in *Sheehan, supra.*

charge itself." In fact, quite the opposite is true. Both our Court of Appeals and at least one court in this District have differentiated for purposes of preliminary relief between cases which allege retaliatory action and those which do not. *Holt v. Continental Group, Inc., supra,* 708 F.2d at 91; *Cuesta v. State of N.Y. Office of Court Admin.* (S.D.N.Y.1983) 571 F.Supp. 392, 394. We note further that these cases have remarked upon the possibility of a kind of irreparable injury to the community at large which stems directly from discriminatory retaliation: namely, the possibility that others will fail to assert their rights or to come forward on behalf of a plaintiff, for fear that they too may be subject to unfavorable action. We think that, although plaintiff has alleged no such fear, such an occurrence is well within the realm of possibility given the circumstances of plaintiff's arrest and the "hands-off" attitude allegedly taken by the defendant.

In sum, we think plaintiff has established that he will suffer irreparable harm if allowed to remain suspended without pay for an indefinite period of time.

## QUESTIONS GOING TO THE MERITS

We are of the opinion that a serious question going to the merits of this action is presented by plaintiff's allegation—not really rebutted by any of the affidavits submitted by defendant—that his employer denied him the common courtesy of identifying him to the police and vouching for his admittedly good record. The affidavit of James Jasey, purportedly submitted in opposition to this contention, asserts that he merely refused a request to provide plaintiff with counsel—a request which plaintiff did not mention making in his original affidavit and contends in his reply affidavit that he in fact never made, an assertion we are inclined to credit in view of the fact that he was then well represented by his present counsel.

We must emphasize that we are here dealing not with a challenge to the INS's right to suspend its employees without pay under appropriate conditions, but merely with a question as to whether or not there is a reasonably arguable issue that the actions here taken against plaintiff were motivated by discriminatory considerations. However, the validity of defendant's contention that it had the absolute right to discharge plaintiff may be tangentially important in that a trier of fact might deem it relevant in determining whether—or to what extent—improper motives might have played a part in defendant's actions. We therefore note that we are far from convinced that defendant did have such absolute right.

Defendant's contention is that under its guidelines [3] it was not required to investigate the circumstances of plaintiff's alleged criminal activity once it had ascertained that the criminal charges brought against him were "work-related." [4] The cases cited in support of this proposition, however, uniformly concern plaintiffs charged with criminal activity directly related to their work: *e.g.,* allegations that an INS border guard deprived aliens of their rights (*Otherson v. Department of Justice* (D.C.Cir.1984) 728 F.2d 1513; *Brown v. Department of Justice* (D.C.Cir.1983) 715

---

**3.** "When there is reasonable cause to believe an employee guilty of a crime for which a sentence of imprisonment may be imposed" the INS may remove or suspend that employee. INS Administrative Manual at § 7(a), p. 18. Charles Sava, Regional Director of the INS, has stated that "[s]uspension without pay is a uniform policy within the INS where there is reasonable cause to believe that an employee has committed a crime for which a term of imprisonment may be imposed and which impact [sic] upon the INS or his employment with the INS." Sava Affidavit at 4.

**4.** The defendant asserts that "reasonable cause" to believe that plaintiff had committed a crime was provided by the mere fact of the information filed against him, since prosecutors' informations are required to be supported by a finding of "probable cause." We are aware of no support for this contention. Since the cases relied upon by defendant, and defendant's argument itself, are bottomed on the issue of "work-relatedness," we need not here consider whether or not the probable cause supporting an information which by its terms is arguably not job-related is sufficient for this consideration.

F.2d 662); that an official of the Department of Housing and Urban Development took bribes in his official capacity (*Jankowitz v. United States* (Ct.Cl.1976) 533 F.2d 538) or was a slumlord (*Wild v. United States Department of Housing and Urban Development* (7th Cir.1982) 692 F.2d 1129); that a Postal Service employee stole Postal Service property (*Alsbury v. United States Postal Service* (9th Cir.1976) 530 F.2d 852, *cert. denied,* 429 U.S. 838, 97 S.Ct. 85, 50 L.Ed.2d 91); that an air-traffic controller used mind-altering drugs (*Borsari v. FAA* (2d Cir.1983) 699 F.2d 106 at 110). We cannot say that these cases eliminate the question as to whether in fact the actions for which plaintiff has been criminally charged—getting into an altercation having no conceivable relation to INS business—are job-related, a proposition of which we remain unconvinced.

## BALANCE OF HARDSHIPS

It seems obvious to us that it poses a very great hardship indeed upon plaintiff to be forced to wait an indefinite amount of time, unable to support his family, until the disposition of his criminal charges. Defendant argues that plaintiff has not attempted to seek work or to obtain unemployment compensation. Plaintiff, however, has not been fired, but merely left in a state of limbo in which he may well have been improperly placed. Since we assume that plaintiff will be reinstated if he is acquitted of the criminal charges, if the charges are dropped, or if the INS decides that its decision that they are "work-related" was incorrect, we do not think that the burden should be upon plaintiff at this time to seek other employment which he will then be forced to leave to regain his job with defendant.

Defendant argues that it, too, will suffer hardship if it is forced to make any changes in plaintiff's status. We accept this argument only in part. We do not accept that the prestige or reputation of the INS will be injured by failing to suspend plaintiff without pay, especially as we are in serious doubt as to whether or not the acts for which he was criminally charged are work-related. Further, we do not think that an arm of the United States Government will be seriously injured by paying one employee a living wage for a limited period of time. We are aware that in this Circuit an award of affirmative preliminary relief to an employee of the Federal Government who wishes to enjoin a personnel action against him must be based on a finding of "irreparable injury sufficient in kind and degree to override the rule that the government, as a matter of policy, should be given the widest latitude in the dispatch of its own internal affairs." *Gibson v. U.S.I.&N.S.* (S.D.N.Y.1982) 541 F.Supp. 131, 137. However,

> [T]he right of federal governmental agencies to be free from the overriding supervisory control of the federal courts is not a free license for those agencies to violate statutorily protected civil rights of their employees with impunity, secure in the knowledge that those harmed will be able to obtain only adequate and prospective relief.

*Id.*

We think that the inability of the plaintiff to support his family for an indefinite period of time overrides defendant's interest in departmental autonomy to the extent that we may order defendant to pay plaintiff a salary until his criminal charges are resolved one way or the other. We decline to order that plaintiff be reinstated, however, as we find that that would unduly encroach upon defendant's autonomy. Even crediting plaintiff's contention—which does not seem to be refuted by defendant—that he lost significant amounts of overtime salary when placed on desk duty, there is no evidence that the overtime pay was necessary for him to support his family. Our finding is simply that defendant may not keep plaintiff suspended without pay; how it achieves this mandate is within its discretion so long as plaintiff receives the base salary to which he was entitled before his suspension, retroactive to the date of his suspension.

In sum, then, we find that plaintiff has established his right to a preliminary injunction, and we hereby issue that injunction as above described.

SO ORDERED.