Michael J. BROWN, Petitioner,

v.

DEPARTMENT OF THE
NAVY, Respondent.

No. 00–3003.

United States Court of Appeals,
Federal Circuit.

Oct. 20, 2000

---

Kevin M. Grile, Assistant General Counsel, American Federation of Government Employees, AFL–CIO, of Chicago, Illinois, argued for petitioner. With him on the brief were Mark D. Roth, General Counsel; and Charles A. Hobbie, Deputy General Counsel, AFGE, of Washington, DC.

Marian E. Sullivan, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and Kathryn A. Bleecker, Assistant Director. Of counsel was Maj. Peter D. Delorier, United States Marine Corps, of Camp Lejeune, North Carolina.

Before SCHALL, BRYSON, and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON. Dissenting opinion filed by Circuit Judge LINN.

BRYSON, Circuit Judge.

Based on a charge of improper personal conduct, Michael J. Brown was removed from his civilian position with the Marine Corps. Mr. Brown appealed his removal to the Merit Systems Protection Board, which upheld the action. Before this court, Mr. Brown contends that the Corps failed to establish a sufficient nexus between the charged off-duty misconduct and the efficiency of the service, and that the

penalty of removal was unjustified. We affirm.

## I

In 1995, after leaving active duty as a Marine Corps officer, Mr. Brown joined the reserves and secured a civilian position with the Marine Corps at Camp Lejeune, North Carolina. He served as area program manager for the Morale, Welfare, and Recreation Department (MWR) at the base. MWR programs provide service members and their families with a variety of services including athletic, recreation, and entertainment activities. An area program manager plans, develops, and coordinates MWR activities for the military personnel assigned to the area.

In 1997, Mr. Brown was removed from his position based on the charge that he had engaged in improper personal conduct having an adverse effect on the efficiency of the service. Specifically, the removal notice charged that Mr. Brown had engaged in an adulterous relationship with the wife of a Marine major assigned to a unit supported by Mr. Brown while the major was deployed overseas.

Following his removal, Mr. Brown appealed to the Merit Systems Protection Board. An administrative judge conducted a hearing and sustained the removal action. The administrative judge found that the affair had occurred as alleged and that the Corps had established a sufficient nexus between Mr. Brown's misconduct and the efficiency of the service. In particular, the administrative judge found that Mr. Brown's misconduct was antithetical to MWR's mission and that it had adversely affected the Corps' trust and confidence in Mr. Brown's job performance. The administrative judge also concluded that the removal penalty was within the limits of reasonableness.

Mr. Brown petitioned the Board for review of the initial decision. The Board denied the petition over a dissent from Vice Chair Slavet, who stated that in her view the Corps had not sustained its burden of showing by a preponderance of evidence that there was a nexus between Mr. Brown's misconduct and the efficiency of the service.

## II

■ An agency may remove an employee only for such cause as will promote the efficiency of the service. 5 U.S.C. § 7513(a). To satisfy that requirement, the agency must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, *i.e.*, that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions. *See, e.g., Mings v. Dep't of Justice*, 813 F.2d 384, 389–90 (Fed.Cir.1987).

### A

■ Because the underlying historical facts relating to Mr. Brown's misconduct are uncontested on appeal, Mr. Brown contends that we should review *de novo* the Board's decision that the Corps has established a nexus between his conduct and the efficiency of the service. In fact, however, the statutory standard that governs our review of decisions of the Merit Systems Protection Board, 5 U.S.C. § 7703(c), requires that we apply deferential review to determinations by the Board as to whether such a nexus has been shown. *See Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984) (It is not our duty to find nexus but rather to decide, under our statutory scope of review in 5 U.S.C. § 7703(c), whether the MSPB affirmance of the agency conclusion on the nexus issue meets the statutory criteria for our affirmance.); *see also White v. United States Postal Serv.*, 768 F.2d 334, 336 (Fed.Cir.1985) (A determination of nexus, one factor in a removal decision, must be affirmed on appeal if supported by substantial evidence.). Absent a mistake of law by the Board in selecting the proper test for analyzing the nexus requirement, which is not present here, we must uphold

the Board's nexus finding if it is supported by substantial evidence.

B

■ Mr. Brown asserts that the evidence was insufficient to show that his misconduct adversely affected either MWR's mission or his ability to perform his job. With respect to the relationship between his misconduct and the department's mission, Mr. Brown argues that his job involved planning and facilitating recreation and entertainment, not assisting Marines and their spouses on personal or family-related problems, and that his misconduct was irrelevant to the task of providing recreation and entertainment to Marine families.

Based on evidence adduced at an evidentiary hearing, the administrative judge found that the purpose of [Mr. Brown's] position, and the MWR Department, was to provide support for the Marines, and the families of those Marines while they are deployed, that Mr. Brown's adulterous affair involved the wife of a Marine officer assigned to one of the units that Mr. Brown was charged with supporting, and that the affair occurred during a period that the officer was deployed overseas. Those findings provided the basis for the administrative judge's conclusion that Mr. Brown's misconduct was antithetical to the agency's very mission, i.e., that there was a sufficient nexus between Mr. Brown's misconduct and the mission of the MWR department where he worked. As the administrative judge put it, the Corps should not have to retain an employee who instead of assisting its deployed Marines, as is the purpose of the MWR and the Program Manager position, has an adulterous affair with the wife of one of those very Marine officers.

The administrative judge's findings regarding the mission of the MWR department and Mr. Brown's responsibilities as program manager were supported by the mission statement of MWR and testimony from several persons familiar with the pro-gram. The mission statement, taken from the MWR Policy Manual, stated that MWR was responsible, in part, for providing military families with well-rounded, wholesome athletic, recreation leisure time activities to ensure their mental, physical, and social well-being; and for providing dining, beverage and entertainment services. An MWR operations officer testified that the program manager was responsible for supporting deployed Marines' families in a variety of ways, including arranging recreation and entertainment events, assisting with events sponsored by Marine spouse volunteers, and attending meetings with various groups. A commander's wife, who coordinated a volunteer family-support program staffed by the spouses of Marines, testified that one of the responsibilities of the MWR program manager was to support her program, which involved substantial contact with Marine spouses.

The administrative judge's findings that Mr. Brown's misconduct adversely affected MWR's ability to perform its mission and undermined management's trust and confidence in his job performance were based on evidence provided by five witnesses who testified at the hearing. The MWR operations officer testified that Mr. Brown's misconduct had undermined the credibility of MWR among the units it was assigned to support, which was very damaging to MWR and to the job [Mr. Brown] was hired to do. The base volunteer coordinator testified that she and other Marine spouse volunteers worked with the MWR program manager, that the purpose of her volunteer program was to promote a healthy community among the Marine families, and that conduct such as Mr. Brown's would threaten her program by put[ting] it in a less than favorable light.

The Assistant Chief of Staff of the MWR division testified that program managers have regular contact with the wives of deployed marines in their capacity as volunteer workers, and that it was important for deploying Marines to be confident

that their families would be well cared for while they were away, a task that was partly the responsibility of MWR program managers. To ignore conduct such as Mr. Brown's, he testified, would undercut the integrity of the organization. He further testified that a commander who learned of Mr. Brown's misconduct would likely come to him and request that Mr. Brown not associate with his personnel in the future, and that he did not think any commander would allow [him] ... to put Mr. Brown back down into one of the program manager positions. When asked about the effect of Mr. Brown's conduct on his efficiency in his position, he explained that Mr. Brown would not be efficient at all. There will practically be no job because I don't believe people will turn to him for the support they would have turned to him [for] had ... this thing not happened. The family readiness officer for one of the Marine Expeditionary Units (MEUs) stationed at the base testified that it was important for deployed marines to trust the MWR program managers, because from their point of view, if they're out there, they should think that people back here, particularly males working with their spouses or involved in activities with their spouses are being professional. And a commander of one of the MEUs at the base testified that if commanders bypassed the MWR program manager, it would degrade the efficiency of the MWR operation.

In his own testimony, Mr. Brown stated that he circulated among his patrons in order to provide quality customer service, a function that would be jeopardized if many patrons did not want to interact with him, and that he served all kinds of patrons including individual Marines, commanders, retirees, volunteers, and family members. He also admitted that he spent a significant portion of his time meeting with volunteers, and that he had attended some of the functions he planned. Mr. Brown also acknowledged that the units in his area of responsibility were not required to use his services.

The witnesses emphasized the special circumstances that made Mr. Brown's misconduct especially troubling in light of the role of MWR in general and the program manager's position in particular. The MWR operations officer testified that the critical factor in this case, in his view, was that the woman with whom Mr. Brown became involved was married to a Marine in one of the units that Mr. Brown was charged with supporting. He testified that the program manager was responsible for supporting the Marine families when the Marines were deployed, and that a commander of the deployed units has to know that he can trust the people who are back here with these families. His marines and sailors can't do their jobs very well if they know there's someone not very trustworthy back there. He further explained that Mr. Brown's job was to make sure that the dependents of the members who were deployed were taken care of. And that didn't happen. The case would have been quite different, he testified, if Mr. Brown had not held a position of trust or if he had had his affair with someone who was not the wife of a Marine in one of the units he was charged with supporting.

We hold that substantial evidence supports the administrative judge's finding of a nexus between Mr. Brown's misconduct and both the mission of his agency in general and his job responsibilities in particular. To be sure, this case is a difficult one because the misconduct was private in nature and did not affect Mr. Brown's official responsibilities in any direct and obvious way. In many settings, such conduct would not be sufficient to justify removal from a civil service position. As the administrative judge found, however, Mr. Brown's position was not an ordinary one. He held a managerial position in an office that was responsible for providing support to Marine families, including the families of Marines who were deployed overseas. The evidence supported the administrative judge's conclusion that, in light of MWR's

responsibilities to the Marine families it served, the trust and confidence of the Marine families and the Marine commanders served by MWR was essential to MWR's proper functioning and to Mr. Brown's performance of his duties within MWR. The evidence further supported the administrative judge's finding that the necessary trust and confidence was undermined by conduct of the sort at issue in this case—initiating an adulterous affair with the wife of a deployed Marine who was a member of a unit that Mr. Brown was directly responsible for supporting. Based on the particular context in which this case arose and the evidence presented to the administrative judge, we cannot agree with Mr. Brown that the administrative judge's nexus finding is unsupported by substantial evidence.

In other settings, off-duty misconduct has been held sufficient to justify an employee's removal where that misconduct was found to be inconsistent with the mission of the employing agency. For example, in *Allred v. Department of Health & Human Services*, 786 F.2d 1128 (Fed.Cir. 1986), this court upheld the removal of an HHS accountant who was convicted of child molestation. The court noted that the mission of HHS is to administer health and social services to various classes of disadvantaged persons, including children, and the agency offered evidence that the victim of Mr. Allred's offense was the kind of person the agency was attempting to help. In that context, where the agency presented evidence that the misconduct was contrary to the agency's mission and that Mr. Allred's supervisors had lost confidence in him, the court held that the agency's evidence was sufficient to justify removal. *See* 786 F.2d at 1131. In another case, *Giles v. United States*, 213 Ct.Cl. 602, 553 F.2d 647, 650 (1977), our predecessor court held that the Internal Revenue Service could fire a revenue officer for failing to file timely federal and state income tax returns. Testimony that such conduct would have a deleterious effect upon the morale of other IRS personnel

and upon the respect which other Government agencies and the public had for IRS, was sufficient, the court explained, to support the employee's removal. 553 F.2d at 650. Similarly, the private use of marijuana was held sufficient to justify the removal of a Customs Inspector, based on the mission of the Customs Service, which is in part to interdict the importation of illegal drugs. *See Masino v. United States*, 218 Ct.Cl. 531, 589 F.2d 1048, 1056 (1978). And an employee of the Department of Housing and Urban Development was held to have been validly removed based on his ownership of deteriorated rental properties on the ground that his conduct undermined public confidence in the agency. *See Wild v. United States Dep't of Housing & Urban Dev.*, 692 F.2d 1129, 1132–34 (7th Cir.1982). Although Mr. Brown's case is distinguishable on its facts from each of the cited cases, the principle applied in each is the same: off-duty conduct that is inconsistent with the agency's mission and that undermines confidence in the employee can be sufficient to justify the employee's removal.

### C

Mr. Brown makes a number of arguments about why the evidence of nexus in this case was insufficient. None of the arguments, however, persuades us that the Board's finding of nexus must be overturned.

First, Mr. Brown argues that he had known the woman with whom he had the affair since before becoming the program manager of MWR. Thus, he contends, he did not use his position in MWR to enter into an adulterous affair with a Marine wife. Nonetheless, the affair occurred while Mr. Brown was serving as the MWR program manager and while the woman's husband—a member of a unit Mr. Brown served—was deployed overseas. To be sure, the case for nexus would have been stronger if Mr. Brown had directly used his position to obtain access to a Marine

wife with whom he then started an affair. But the fact that the relationship did not develop as a direct result of Mr. Brown's activities as program manager of MWR does not affect the loss of confidence and trust in him as a person responsible for the morale and welfare of Marine families, nor does it eliminate the concern over the inconsistency between his conduct and the mission of his agency.

Mr. Brown makes the related argument that in light of the unusual circumstances surrounding his affair, he is no more likely than anyone else to have an affair in the future with the spouse of a Marine he is charged with supporting. But there is no requirement that the agency prove that particular misconduct is likely to recur. *See Yacovone v. Bolger,* 645 F.2d 1028, 1033 (D.C.Cir.1981). In any event, the evidence established that Mr. Brown's misconduct violated the mores of the Marine community, and it is not irrational to conclude from that fact alone that those mores have less coercive power over him than over others. In light of the fact that Mr. Brown's position involved more than minimal contact with Marine spouses, it would not be unreasonable to conclude that Mr. Brown posed a greater-than-average risk of future, job-related misconduct, and that such misconduct could again cause problems for MWR.

Second, Mr. Brown points out that the Corps failed to elicit specific testimony from Mr. Brown's patrons that they would no longer use his services. Nonetheless, we cannot say that the administrative judge's finding to that effect was unsupported by substantial evidence. The deciding official, who oversaw MWR, testified about his prior experience as a unit commander. His testimony that unit commanders would not want their units dealing with Mr. Brown, which was unrebutted by any evidence or cross-examination from Mr. Brown, reasonably supported the administrative judge's finding. In addition, the MEU commander testified that conduct such as Mr. Brown's would leave a bad taste in everyone's mouth, and that a commander could bypass the services of a program manager, which would degrade efficiency. The commander's testimony was not inconsistent with that of the deciding official, which was sufficient on the issue.

■ Third, Mr. Brown argues that his job performance was not affected by his off-duty misconduct. Management, however, was concerned not about a deterioration in Mr. Brown's actual performance, but about a loss of confidence in MWR and in Mr. Brown due to his patrons' knowledge of the affair. As this court explained in the *Allred* case, where an employee's conduct is contrary to the agency's mission, the agency need not present proof of a direct effect on the employee's job performance. 786 F.2d at 1131.

Finally, Mr. Brown complains that he was held to a military, rather than civilian, standard of conduct. In support, he cites the testimony of the deciding official, who stated that civilian employee[s], in my estimation, are expected to uphold really the same standards because they are people standards, they're human standards.

Contrary to Mr. Brown's suggestion, the mores of the group he served are not irrelevant to his job performance and the expectations fairly placed upon him. Conduct that might be overlooked in some settings can be the cause for removal in other settings in which the conduct is perceived as more clearly inappropriate or contrary to the mission of the employing agency, such as in the *Allred, Masino, Giles,* and *Wild* cases cited earlier. In each of those cases, removal was based in large part on the nature of the particular agency involved; conduct that justified removal in those contexts might not have justified removal in ordinary settings. Mr. Brown's job responsibilities were to serve the Marine community, and his effectiveness depended at least to some extent on his compliance with certain basic standards of conduct shared by that community. Moreover, he chose to serve the Ma-

rine community, and because of his long membership in and association with that community, he was well aware of the standards of that community. Because his job was to serve the Marine community, it is not a sufficient answer for him simply to say that he was a civilian employee and therefore the standards of conduct of the Marine community had no applicability to him.

In various of the arguments he makes, Mr. Brown relies on the dissenting opinion of Board Vice–Chair Slavet. While we acknowledge that there is force to many of the points made in Vice–Chair Slavet's opinion, it is important to note that our posture in reviewing the Board's decision is quite different from that of the Board in making it. The task of the Board is to decide whether the agency met the burden of proving a nexus by a preponderance of the evidence. *See* 5 U.S.C. § 7701(c)(1)(B). Our task, by contrast, is to determine whether the Board's finding is supported by substantial evidence, which is a considerably less exacting standard. *See, e.g., Schnakenberg v. United States,* 219 Ct.Cl. 697, 698 n. 1, 618 F.2d 120 (1979) (substantial evidence can support either of two contrary findings, but only one finding can have a preponderance). Regardless of whether we would have resolved this case as the Board did if we had sat as the finders of fact, we are unable to say that substantial evidence does not support the finding made by the Board.

### III

Mr. Brown contends that even if the government proved a sufficient nexus in this case, the penalty of removal was unjustified. In upholding the penalty, the administrative judge noted that the deciding official had considered the factors set forth in *Douglas v. Veterans Administration,* 5 MSPB 313, 5 M.S.P.R. 280 (1981). The administrative judge concluded that the deciding official had considered the appropriate factors and had not reached an unreasonable conclusion as to the choice of penalty in light of those factors.

Mr. Brown's principal contention in challenging the penalty is that he never received notice that his civilian employment could be affected by an adulterous affair with a Marine spouse. In that regard, the deciding official found that Mr. Brown's status as a major in the reserves provided sufficient notice; Mr. Brown thinks that status was insufficient to warn him of the consequences for his civilian job.

The lack of formal notice concerning the adverse effects of an adulterous affair with the spouse of a Marine does not rise to the level of a significant mitigating factor that MWR and the Board failed to consider. Mr. Brown's military background and position within a military community should have put him on notice that the affair could cause serious problems within the community. As this court noted in *Brown v. Department of Transportation,* 735 F.2d 543, 548 (Fed.Cir.1984), even if MWR did not provide an express warning to Mr. Brown regarding the consequences of an adulterous affair with a Marine spouse, his common sense should have forewarned him.

The same analysis pertains to Mr. Brown's related contention that the penalty of removal was inappropriate because of the unique or exceptional nature of this case. Cases involving off-duty misconduct often involve unusual facts that arise in a specific context, and the particular circumstances and context are often sufficiently distinctive that there are no closely analogous cases in which similar action has been taken. The fact that there may be no direct precedent for the action taken in a particular case does not, however, prohibit the agency from taking adverse action if it is consistent with general principles of federal employment law. We are satisfied that the agency's action in this case did not depart from those principles so as to render the penalty invalid.

**1364**

■ In reviewing the propriety of a penalty, this court necessarily accords considerable discretion to the agency. We will not overturn a penalty within the agency's discretion unless the severity of the agency's action appears totally unwarranted in light of all the factors. *Mings,* 813 F.2d at 390. Given the totality of the circumstances of this case, Mr. Brown has not persuaded us that his removal was totally unwarranted, and we therefore uphold the agency's action.

Each party shall bear its own costs for this appeal.

AFFIRMED.

LINN, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion because there is no showing that Brown's private consensual conduct, improper though it was, had an adverse impact on the efficiency of the service. The Board, and the majority opinion, has stretched the nexus requirement so thin that Brown has become subject to the moral judgments of his employer. As one of our sister circuits has repeatedly pointed out, that is an improper role for the government. *See Norton v. Macy,* 417 F.2d 1161, 1165 (D.C.Cir.1969) ( [T]he notion that it could be an appropriate function for the federal bureaucracy to enforce the majority's conventional codes of conduct in the private lives of its employees is at war with elementary concepts of liberty, privacy, and diversity.); *Doe v. Hampton,* 566 F.2d 265, 273 n. 20 (D.C.Cir.1977) (The nexus requirement ... serves to minimize unjustified governmental intrusions into the private activities of federal employees.); *Gloster v. General Servs. Admin.,* 720 F.2d 700, 703 (D.C.Cir.1983) (The nexus requirement is particularly strict in cases involving non-work-related misconduct.).

## BACKGROUND

Preliminarily, I wish to clarify two points in the majority's presentation of the factual background of this case. First, in my view the misconduct in this case has not been clearly framed. Brown's relationship with a married woman predated his position at Camp Lejeune and had no causal connection with his job. He was a neighbor of the woman and met her before he started working at Camp Lejeune. There was no evidence in the record that his contacts with the woman occurred at, were facilitated in any way by, or were related to any events or activities sponsored by the MWR Department. Even Colonel Stewart, the official who removed Brown, stated that there was no allegation that Brown used his position to further his misconduct.

Second, the impact of Brown's misconduct on his job has not been clearly framed. The record reveals no evidence at all of any negative impact. The record indicates that Brown received the highest possible performance appraisal, and a Certificate of Commendation, for the period covering virtually the entire duration of his misconduct. Even Colonel Helland, testifying against Brown at the Board's evidentiary hearing, could not criticize Brown's support of the Colonel's unit. Colonel Helland stated that Brown's performance was adequate and that the Colonel had no complaints.

With that framework in mind, I now address the Board's finding, which the majority affirms, that Brown's misconduct somehow had adversely affected the efficiency of the service. As all parties recognize, an employee can only be removed for such cause as will promote the efficiency of the service. 5 U.S.C. § 7513(a) (1994); *Crofoot v. United States Gov't Printing Office,* 761 F.2d 661, 664 (Fed.Cir.1985); *see also Pararas–Carayannis v. Department of Commerce,* 9 F.3d 955, 957 (Fed. Cir.1993). This requires that there be a nexus between the employee's misconduct and the efficiency of the service. *Sanders v. United States Postal Serv.,* 801 F.2d 1328, 1332 (Fed.Cir.1986); *see also Pararas–Carayannis,* 9 F.3d at 957. The Board

summarized the ways in which such a nexus can be shown as consisting of: (1) existing egregious circumstances that give rise to a rebuttable presumption of nexus based on the nature and gravity of the misconduct; (2) preponderant evidence showing that the misconduct affects the employee's or his co-worker's job performance; (3) preponderant evidence showing that the misconduct affects management's trust and confidence in the employee's job performance; and (4) preponderant evidence showing that the misconduct interfered with or adversely affected the agency's mission. *See Brown v. Department of Navy*, No. DC–0752–97–1018–I–1, slip op. at 7 (M.S.P.B. Jan.2, 1998) (the AJ's opinion) (*Board Opinion*). The Board did not find that Brown's misconduct had affected his job performance. The Board relied only on the last two of these four possible avenues to a nexus, and I address below the lack of substantial evidence to support each.

### ANALYSIS

#### 1. Trust and Confidence

The AJ found that the agency has ... proven nexus by showing by preponderant evidence that [Brown's] misconduct affected management's trust and confidence in his job performance. *Board Opinion*, slip op. at 11. As the AJ correctly pointed out, and our own case law requires, management's loss of trust and confidence must be directly related to the employee's job performance. *See Pararas–Carayannis*, 9 F.3d at 956–58 (Employee used both government time and money to launder prostitution proceeds.); *Sanders*, 801 F.2d at 1330 (Employee used agency premises and on-duty time, on two occasions, to engage in the sale of cocaine.); *Brown v. Department of Transp.*, 735 F.2d 543, 545, 548 (Fed.Cir.1984) (Air traffic controller supervisor spoke at an off-duty rally of striking air traffic controllers, thus implicating his own loyalty to management.).

However, all of the evidence adduced at the Board's hearing was conjectural, speculative, or unrelated to Brown's actual job responsibilities. Bear in mind that Brown's principal role was to organize activities for Marines in the units he supported; Brown did not occupy a position, such as a counselor or therapist, that would require that the Marines he supported repose confidence and trust in him. Colonel Helland, the commanding officer of an expeditionary marine unit, stated that Brown's job was to be a facilitator, making it easier to obtain resources and facilities, and Mr. Mayberry, a family readiness officer, described Brown's job as a party and recreation event planner.

Representative of this evidence is the testimony of Colonel Stewart, Assistant Chief of Staff of the MWR Department, commonly known as the head of the MWR. Colonel Stewart speculated in his testimony, emphasis added, that Brown *will* not be efficient at all and that he did not believe that people *will* turn to him for [ ] support. But Colonel Stewart did not connect this perceived blackballing of Brown by others to Brown's actual job responsibilities of planning events. Mr. Blare, Director of the Operations Division of the MWR Department and Operations Officer of the MWR Department, also testified in a conclusory fashion. He stated that anything short of removal would not solve the problem, but failed to identify what aspect of Brown's job performance was in question. Mrs. Leferbre, a key volunteer coordinator and the wife of a commanding officer, stated that the wives of deployed Marines may be vulnerable. She also expressed her opinion that Brown's indiscretion would threaten the reputation of her program, the key volunteer program. However, she did not provide any evidence that Brown's job performance had been impaired or how it would be impaired because of his indiscretion. Colonel Helland testified to the generality that family problems can have considerable impact on a unit's perspective, but failed to provide any evidence that Brown's job performance had been compromised or might be im-

paired because of his particular misconduct. Mr. Mayberry opined generally that the Marines Brown served needed to be able to trust Brown, but Mr. Mayberry offered no evidence that any Marines had lost trust or that Brown's actual job performance would be impaired because of Brown's indiscretion. The testimony identified by the majority opinion fares no better. *See ante*, at 1359–60 (majority opinion) (repeatedly using the conditional would). In my opinion, there is not substantial evidence of record showing that management's loss of confidence is related to Brown's actual job performance.

Rather than requiring a connection to an employee's job performance, the majority opinion risks being viewed as sanctioning the removal of an employee simply because of a difference in values between that employee and his superiors. Colonel Stewart testified to this effect: I can't imagine a marine commander wanting to deal with somebody who has ... a track record of this kind of thing. Brown's superiors, including his immediate boss and two Marine Colonels, essentially testified that they disapproved of Brown's behavior. If this evidence is enough to warrant removal, then no employee is safe from the threat of removal. Mr. Blare testified that it would have been different if Brown had held some other position, specifically, a janitor, in the MWR Department. However, Mr. Blare fails to provide any connection between Brown's personal indiscretion and his actual job performance, without which a charge of loss of trust and confidence in that performance rings hollow. Again, the only evidence of Brown's performance is positive.

The situation might be different if the record contained testimony from those Marines and their families who were not in a position of authority over Brown and whom Brown was charged with supporting. *See Brown v. Department of Navy*, No. DC–0752–97–1018–I–1, slip op. at 7, 83 M.S.P.R. 230 (M.S.P.B. Aug.10, 1999) (Slavet, Vice Chair, dissenting) (raising the same issue). The AJ recognized the utility of such evidence, asserting that Brown had lost his credibility, integrity and ability to function with [the Marines and their families] as a result of his misconduct, and that this directly interfered with his ability to accomplish his assigned mission. *Board Opinion*, slip op. at 9. However, this finding is totally unsupported by any testimony from those Marines and their families. The Board and the majority opinions include only testimony, such as that discussed above, that is premised on the surmised disapproval of the Marines, or the families of the Marines, in the units supported by Brown.

Testimony from these supposedly disapproving individuals would have served to establish the necessary connection with Brown's job performance. These individuals might have testified that they no longer felt comfortable attending the functions that Brown organized or having Brown attend those functions as part of his assigned duties. The deployed Marines might have testified that they no longer felt comfortable having their families attend those functions while they were deployed. Key volunteers that were also the wives of Marines that Brown was charged with supporting might have testified that they no longer felt comfortable working with Brown in organizing events. Such testimony could have demonstrated that Brown's job performance and effectiveness would indeed have been impaired, in that he would have been unable to attend the events he planned, to get others to attend them, or even to plan them in the first place. Many possibilities were open to the Government to establish a connection between Brown's personal conduct and his actual job responsibilities and performance, but the Government did not avail itself of them.

Such testimony would also have served as a hedge against an abuse of power by Brown's superiors. Before the Government enforce[s][its] conventional codes of conduct in the private lives of its employ-

ees, *Norton*, 417 F.2d at 1165, it has the responsibility to establish the necessary connection between the employee's off duty misconduct and the employee's job-related responsibilities, *White v. United States Postal Serv.*, 768 F.2d 334, 336 (Fed.Cir.1985).

### 2. Agency Mission

The AJ also found that the agency has proven nexus ... by showing by a preponderance of the evidence ... that [Brown's] misconduct ... interfered with and adversely affected the agency's mission. *Board Opinion*, slip op. at 8. As this court has recognized, such a finding provides a nexus without a direct showing of an impact on the employee's job performance. *See Allred v. Department of Health and Human Servs.*, 786 F.2d 1128, 1131 (Fed. Cir.1986) (Courts have repeatedly held that where an employee's misconduct is contrary to the agency's mission, the agency need not present proof of a direct effect [sic—affect] on the employee's job performance.) (citing *Masino v. United States*, 218 Ct.Cl. 531, 589 F.2d 1048 (1978) and *Giles v. United States*, 213 Ct.Cl. 602, 553 F.2d 647 (1977)); *see also Masino*, 589 F.2d at 1056; *Giles*, 553 F.2d at 650.

However, the Board does not discuss the mission of the agency, which in this case is the Department of the Navy. *See Board Opinion*, slip op. at 1. Instead, the Board, and the majority opinion, focus on the mission of the MWR Department and the purpose of Brown's position:

> The agency has established ... that the *purpose of the appellant's position, and the MWR Department*, was to provide support for the Marines, and the families of those Marines while they are deployed. Since Major "B" was a Marine Officer who was assigned to one of the very MEU's [sic—MEUs] that the MWR Department, and the appellant's position, existed to support, and that the affair took place during the time Major "B" was deployed overseas with his unit, I find that the agency has sufficiently

established that that [sic] the appellant's misconduct was antithetical to the *agency's very mission.*

*Board Opinion*, slip op. at 10–11 (emphasis added). In measuring employee conduct, it is the agency's mission at large that must be considered and not merely a division or lesser group within the agency. I have found no case from this, or any other, court, in which the mission of a unit smaller than the agency was considered. *See Allred*, 786 F.2d at 1129 (focusing on the mission of the Department of Health and Human Services); *Stump v. Federal Aviation Admin.*, 761 F.2d 680, 681 (Fed. Cir.1985) (focusing on the mission of the Federal Aviation Administration); *Giles*, 553 F.2d at 650 (focusing on the mission of the Internal Revenue Service); *Masino*, 589 F.2d at 1050, 1055 (focusing on the mission of the United States Customs Service). Further, the cases consistently focus on: (1) broad purposes, as opposed to more narrower purposes of a division or other lesser group within the agency; and (2) the public's perception, which is not likely to be concerned with or even aware of the divisions or lesser groups within an agency. *See Allred*, 786 F.2d at 1131 (focusing on whether the misconduct might undermine public confidence in the agency); *Stump*, 761 F.2d at 681–82 (focusing on the broad purpose of the FAA and public confidence in that agency); *see also Borsari v. Federal Aviation Admin.*, 699 F.2d 106, 110 (2nd Cir.) (addressing the goals of the FAA, the agency, to establish a mission connection), *cert. denied*, 464 U.S. 833, 104 S.Ct. 115, 78 L.Ed.2d 115 (1983); *Wild v. United States Dep't of Hous. and Urban Dev.*, 692 F.2d 1129, 1133 (7th Cir.1982) (listing numerous examples of, and focusing exclusively on, broad purposes of various agencies). This would be a different case if the Board's decision and the evidence of record had established that Brown's misconduct had implicated this country's national defense, arguably the mission of the Department of the Navy. But the mission of the Navy was

not discussed and I must conclude that the Board committed legal error by finding a nexus on this ground.

By focusing on the MWR Department, and then even on Brown's particular job, the Board and the majority are simply restating their belief that Brown's job performance would be impacted. However, again, there is no evidence showing any connection between Brown's misconduct and his job performance.

### 3. Off–Duty Conduct

The majority opinion cites the three cases of *Masino*, *Giles*, and *Allred*, all of which are binding on this court, for the proposition that off-duty conduct can give rise to a nexus. First, having cited *Brown v. Department of Transp.* earlier, I certainly do not quarrel with the position that off-duty conduct can give rise to a nexus. However, neither that case, nor any of the three raised by the majority opinion, reverses the long-standing rule that a trust and confidence nexus must contain a connection to the employee's actual job responsibilities and performance. Indeed, *Brown v. Department of Transp.* supports this rule, and the other three cases rely principally on the egregious nature of the misconduct or its impact on the agency's mission to establish a nexus.

The court in *Brown v. Department of Transp.* first examined the specific requirements of Brown's supervisory position and observed that [c]ooperation, loyalty, and trust are particularly important among those managing the operation of a complex, sophisticated transportation system where the lives of hundred of innocent members of the public may ... depend upon split-second judgment. Such need for trust was even more acute at the moment Brown uttered his remarks.... *Id.* at 547. The court later concluded that it was common sense that Brown's actions could easily turn into a situation where his loyalty to management could be cast in doubt—as indeed it was. *Id.* at 548. Thus, management's loss of trust and con-

fidence in Brown was directly connected to his job performance.

In *Masino*, the Court of Claims upheld the removal of a Customs Inspector for the off-duty smoking and transporting of marijuana. The *Masino* court upheld the nexus finding based principally on the egregious nature of the conduct, a ground specifically not found in the present case. *See Masino v. United States*, 218 Ct.Cl. 531, 589 F.2d 1048, 1056, 1057 (1978) (stating in its analysis that the transportation and use of the very contraband which a law enforcement officer is sworn to interdict, is clearly misconduct which "speaks for itself," and summarizing in its conclusion that [t]he misconduct speaks for itself.); *Board Opinion*, slip op. at 8 (I do not find that [Brown's] misconduct in this instance was so egregious that "it speaks for itself," and that a "presumption of nexus" is applicable.).

Further, although the *Masino* court presented a subsidiary justification for finding a nexus, that justification is best characterized as being based on an adverse impact with the mission of the United States Custom Service, the agency in *Masino*. The *Masino* court stated that Masino ... was specifically charged with enforcing the laws concerning contraband, including marijuana. Since possession and/or use of marijuana is a violation of federal criminal statues, he was clearly not conducting himself in a manner to be expected of a Government employee engaged in law enforcement duties. *Masino*, 589 F.2d at 1056. The *Masino* court thus contrasted the broad purpose of enforcing the laws concerning contraband, common to all Customs Inspectors, with Masino's obvious contravention of those same laws. *Id.* The implication is clear that the mission of the United States Customs Service was adversely impacted by Masino's behavior. *See Allred*, 786 F.2d at 1131 (identifying *Masino* as a case where the nexus was based on an adverse impact on the mission of the agency).

In *Giles*, the Court of Claims upheld the removal of an Internal Revenue Service (IRS) revenue officer for his own willful, flagrant violation of tax laws in not filing or not timely filing his state and federal tax returns over a three year period. *Giles*, 553 F.2d at 648, 649. The *Giles* court based its nexus finding on the impact that Giles' behavior had on the overall effectiveness and credibility of the agency, the IRS, stating that:

> If ... taxpayers are encouraged to believe they can unilaterally determine whether or not to file ..., the need for investigations increases and the efficiency of the Service is impaired. [Giles'] example undercuts the Service's efforts to encourage voluntary compliance and, if condoned, could impair the credibility of IRS with tax officers and the public generally.

*Id.* at 650; *see also Allred*, 786 F.2d at 1131 (identifying *Giles* as a case where the nexus was based on an adverse impact on the mission of the agency). Thus, the *Giles* court upheld a finding of nexus based on an impact to the IRS' mission, not to Giles' job performance.

In *Allred*, this court upheld the removal of an employee of the Department of Health and Human Services (HHS) based on his conviction for child molestation. *See Allred*, 786 F.2d at 1129–30. The misconduct was considered so egregious that a nexus was presumed, thus no connection to Allred's job performance needed to be shown. *See id.* at 1131.

The egregiousness of the misconduct also led the *Allred* court to uphold the finding of nexus on two secondary grounds, finding both an adverse impact on the mission of the agency, HHS, and a loss of management's trust and confidence in Allred's job performance. However, the *Allred* court tied the loss of trust and confidence to Allred's specific duties, which included represent[ing] the agency before state and local governments, universities, hospitals, and various other grantees in preparing cost allocation plans to ensure the plans conformed with the agency's regulations. *Id.* at 1129. The *Allred* court found that management had lost trust and confidence in Allred's ability to represent HHS with these groups that were outside of the agency. *See id.* at 1131. Although the *Allred* court does not appear to have required any testimony from these clients of Allred's, as I would require in the present case, the egregiousness of Allred's misconduct, and the attending presumption of nexus, precluded the need for doing so.

### CONCLUSION

Although I cannot condone Brown's conduct, I also cannot concur in the majority opinion. It grants virtually unbridled discretion to management, allowing it to remove an employee based on disapproval of that employee's off-duty behavior that does not implicate either job performance or the mission of the agency, in this case the Navy. Accordingly, I respectfully dissent and would reverse the decision of the Board.