NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CLAY MARTIN,**
*Petitioner*

**v.**

**DEPARTMENT OF HOMELAND SECURITY,**
*Respondent*

---

2020-1810

---

Petition for review of an arbitrator's decision by Samuel Vitaro.

---

Decided:  May 5, 2021

---

CLAY MARTIN, Macomb, MI, pro se.

RUSSELL JAMES UPTON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent.  Also represented by JOHN V. COGHLAN, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

---

Before TARANTO, BRYSON, and CHEN, *Circuit Judges*.

PER CURIAM.

Clay Martin was removed from his position as a Deportation Officer with the United States Immigration and Customs Enforcement (ICE or Agency) in the Department of Homeland Security in October 2018, based on four charges: conduct unbecoming a law enforcement officer, unauthorized use of a government database, unauthorized use of an agency resource, and lack of candor. Mr. Martin and the American Federation of Government Employees, Local 46 (the Union) invoked arbitration following removal. An arbitrator affirmed the Agency's decision, finding that all four charges were supported by the evidence and the penalty of removal reasonable. S.A. 1–46. We affirm.

I

A

Mr. Martin began working for ICE in August 2008, and he eventually became a Deportation Officer, a GS-12 position, in the Detroit Field Office. S.A. 2. His removal stems from events that began on the evening of May 18, 2017, when Mr. Martin was off duty and driving in his personal vehicle in Macomb Township, Michigan, with his 10-year-old son. The prelude to the disputed aspects was Mr. Martin driving on a road when a car, driven by Donald Van-Zile III, merged into Mr. Martin's lane very closely in front of him. S.A. 2. According to a traffic-camera video, Mr. Van-Zile braked, and Mr. Martin braked behind Mr. Van-Zile's car. S.A. 2, 71. Mr. Van-Zile then turned right into an apartment complex and stopped his car in the driveway. S.A. 2, 71. Mr. Martin soon stopped behind Mr. Van-Zile's car, though he testified that he did not purposely follow Mr. Van-Zile into the driveway; instead, he asserted, his car slid into the driveway after he braked on the road. *See* S.A. 2, 244, 362–63.

According to Mr. Martin, Mr. Van-Zile immediately jumped out of his vehicle and ran toward Mr. Martin while yelling. Mr. Martin left his vehicle and confronted Mr. Van-Zile—in an attempt, in Mr. Martin's version, to protect himself and his son. *See* S.A. 3, 134, 244, 273–74. Then he escorted Mr. Van-Zile, without force, back to Mr. Van-Zile's car and ordered him to get in and turn off the engine. *See* S.A. 3, 193, 246, 339, 344. Mr. Van-Zile sat down in his driver's seat but refused to turn off the engine, and Mr. Martin reached into the vehicle through the open driver door to try to turn off the engine himself. S.A. 3, 344–45. But before the engine could be turned off, Mr. Van-Zile, again in Mr. Martin's version, accelerated his car, dragging Mr. Martin a few feet before he fell out of the vehicle through the still-open door. S.A. 3, 193, 346–48, 363–64, 371. Mr. Martin further recalled that he believed Mr. Van-Zile was intoxicated because he smelled alcohol. *See* S.A. 3, 193.

Mr. Van-Zile recalled the events somewhat differently, and the arbitrator credited his recollection. S.A. 3; *see also* S.A. 111–28, 199–218. According to Mr. Van-Zile, after he stopped his car in the driveway, Mr. Martin approached him. *See* S.A. 116, 202–05. While Mr. Van-Zile was opening the door to his car, Mr. Martin allegedly grabbed his arm and pushed him back into the vehicle. *See* S.A. 117–19, 202–05. Mr. Van-Zile claims that he then tried to get away from Mr. Martin but denies "dragging" Mr. Martin. *See* S.A. 209–11.

Mr. Martin then returned to his vehicle and called 911. S.A. 4, 78. Thereafter, Mr. Martin called his supervisor Ken Watson, as well as ICE attorney Tim McDonald. S.A. 4. According to Mr. Martin, Mr. McDonald instructed him to take steps to identify the other driver; Mr. Martin then logged into an agency database, Consolidated Lead Evaluation and Reporting (CLEAR), to "run" the license number on Mr. Van-Zile's car and obtain his home address. S.A. 5–6, 303–05. Mr. McDonald, however, denied authorizing

Mr. Martin to use government resources to gather information about Mr. Van-Zile. *See* S.A. 5 n.3, 233–37.

Deputies Nicholas Macioce and Anthony Szalkowski of the Macomb County Sheriff's Office then arrived on the scene. S.A. 6. On recordings from their body cameras, Mr. Martin can be heard telling them, in his account of the preceding events, that he "grabbed" Mr. Van-Zile by the arm, took him back to Mr. Van-Zile's vehicle, and told him to sit down and shut his engine off; that he asked for Mr. Van-Zile's identification; and that he believed Mr. Van-Zile was intoxicated. *See* S.A. 6, 89–90. In his interaction with the deputies, Mr. Martin grew upset with Deputy Macioce, partly due to a previous incident between the two, involving Mr. Martin's stepdaughter. *See* S.A. 7. Mr. Martin also had some conflict with Deputy Szalkowski, who advised Mr. Martin several times to return to his vehicle, which he refused to do. S.A. 7, 152–54.

On the following day, Mr. Martin accessed the National Criminal Information Center (NCIC) database, which required him to first log into the Agency's Treasury Enforcement Communication System (TECS), to conduct a record inquiry for Mr. Van-Zile. S.A. 8–9, 590. Both databases are for official use only. *See* S.A. 9.

In September 2017, Mr. Martin submitted a complaint to the Malcomb County Sheriff's Office regarding the police report that Deputy Macioce prepared about the events of May 18, 2017. S.A. 219–22; *see also* S.A. 188–92 (police report). In his complaint, Mr. Martin disputed the facts listed in the police report and noted that some of his actions on May 18, *i.e.*, running Mr. Van-Zile's license plate and speaking with Mr. Van-Zile's spouse, were in service of the "federal investigation" into Mr. Van-Zile "that was underway." S.A. 219–20.

B

On June 1, 2017, the Deputy Field Office Director for the Detroit Field Office of ICE reported Mr. Martin's May 18 incident to the Agency's Joint Intake Center. S.A. 196–97. The Agency's Office of Professional Responsibility then investigated. S.A. 11. After the investigation, which included an interview of Mr. Martin in January 2018, the Deputy Field Office Director proposed removing Mr. Martin based on four charges: conduct unbecoming a law enforcement officer, unauthorized use of a government database, unauthorized use of an agency resource, and lack of candor. S.A. 609–19 (Notice of Proposed Removal). On October 16, 2018, the Field Office Director, Rebecca Adducci, sustained all the charges and underlying specifications and decided on removal as the penalty. S.A. 47–64.

The Union invoked arbitration, and a hearing was held on June 11, 2019, during which both Mr. Martin and Ms. Adducci testified in person. S.A. 17, 69. Written closing arguments were submitted on August 12, 2019. S.A. 1.

On February 23, 2020, the arbitrator issued his opinion, sustaining all four charges for removal but finding that not all underlying specifications were proven by a preponderance of the evidence. S.A. 1, 19–36. The arbitrator also upheld removal as a reasonable penalty to promote the efficiency of the service. S.A. 36–44.

Mr. Martin timely appealed. We have jurisdiction under 5 U.S.C. §§ 7703(b)(1)(A) and 7121(f).

II

A federal employee may challenge disciplinary action taken by an employer by appealing to the Merit Systems Protection Board or by seeking arbitration under a grievance procedure established by a collective bargaining agreement. *See* 5 U.S.C. § 7121(e)(1). Here, Mr. Martin invoked arbitration. We review the arbitrator's decision "under 5 U.S.C. § 7121(f) using the same standard of

review that applies to appeals from decisions of the [Board]." *Buffkin v. Dep't of Defense*, 957 F.3d 1327, 1329 (Fed. Cir. 2020).

Thus, we must uphold the arbitrator's decision unless we conclude it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," was "obtained without procedures required by law, rule, or regulation having been followed," or is "unsupported by substantial evidence." 5 U.S.C. § 7703(c); *see also Buffkin*, 957 F.3d at 1329–30. On factual questions, we do not "substitute our judgment for that of the [arbitrator]," *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1366 (Fed. Cir. 2012), but ask only if, on all the evidence, the arbitrator's findings were reasonable, even if contrary findings might also have been reasonable, *see Jones v. Dep't of Health & Hum. Servs.*, 834 F.3d 1361, 1366 (Fed. Cir. 2016).

A

As an initial matter, Mr. Martin argues that the arbitrator's decision was untimely for failure to comply with the deadlines listed in the collective bargaining agreement that governs the arbitration. Martin Opening Br. at 2–3. The agreement outlines an "expedited procedure" in matters involving removal, in which "the parties have agreed to ask the arbitrator to adhere to the following time lines": "Arbitrators are to render a decision within fifteen (15) workdays of closing of the record. The record will be considered closed upon receipt of briefs, receipt of transcript, or completion of hearing whichever is later." Pet. Appx. 70. Mr. Martin argues that the deadline for the arbitrator to render his decision was September 3, 2019, 15 workdays after the submission of written closing arguments on August 12, 2019. Martin Opening Br. at 2–3. But the collective bargaining agreement does not set a firm deadline; it simply "ask[s] the arbitrator to adhere" to a "time line[]." Pet. Appx. 70. When an agreement "specifies no consequence for failure to observe" a deadline, it is "merely a

housekeeping rule" that is not binding on the parties. *Muller v. Gov't Printing Off.*, 809 F.3d 1375, 1382 (Fed. Cir. 2016).

## B

### 1

To prove Charge 1 (conduct unbecoming a law enforcement officer), it sufficed for the Agency to prove the alleged misconduct, as long as the proof of the specification, given in narrative form, shows that the conduct adversely affects efficiency of the service. *See Otero v. U.S. Postal Serv.*, 73 M.S.P.R. 198, 202–03 (1997); *see also Abruzzo v. Social Security Admin.*, 489 F. App'x 449, 454 (Fed. Cir. 2012) (per curiam) (describing unbecoming conduct as "conduct that revealed a temperament that detracted from character or reputation" (internal quotation marks omitted)). If the Agency has alleged multiple specifications to support its charge, "'proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge.'" *Lachance v. Merit Sys. Prot. Bd.*, 147 F.3d 1367, 1371 (Fed. Cir. 1998) (quoting *Burroughs v. Dep't of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990)). The arbitrator reasonably found that the Agency proved Charge 1 upon finding that the Agency proved seven of the ten specifications supporting it.[1]

Specification 1 alleged that Mr. Martin tried to engage in "police action" while accompanied by a minor, *i.e.*, his 10-year-old son. S.A. 20. Mr. Martin, who does not dispute that his minor son was present for the interactions with Mr. Van-Zile on May 18, 2017, argues that he was not engaged in a "police action" then, because he equates "police action" with using "police power," which he defines as

---

[1]    The arbitrator determined that Specifications 2, 7, and 10 were either not proven or did not meet the standard of unbecoming conduct. *See* S.A. 23, 26–27, 29.

exercising the "sovereign right of a government."  Martin Opening Br. at 10–11 (citing *Police power*, Black's Law Dictionary (6th ed. 1990)).  The arbitrator reasonably found that the Agency proved this specification: In his September 2017 complaint to the Macomb County Sheriff's Office, Mr. Martin stated that he was "attempting to take *police action*" against Mr. Van-Zile.  S.A. 219 (emphasis added); *see also* S.A. 241 (Mr. Martin describing during his Agency interview the interaction with Mr. Van-Zile as a "traffic stop").  Substantial evidence, therefore, supports the arbitrator's finding that Mr. Martin attempted to engage in a police action while accompanied by a minor, which was "conduct unbecoming a law enforcement officer."  S.A. 23.

Specifications 3, 4, 5, and 6 all involve Mr. Martin's behavior toward Mr. Van-Zile having the character of exercising official authority—namely, he grabbed Mr. Van-Zile (Specification 3), told him to "sit down and shut your car off" (Specification 4), instructed him to provide identification (Specification 5), and reached into the car from the driver's side to turn the car off (Specification 6)—while Mr. Martin was not engaged in official Agency duties.  S.A. 24–26.  The arbitrator reasonably found that the Agency proved the allegation in each of these specifications.  In doing so, the arbitrator found Mr. Martin's testimony about what transpired to be less credible than Mr. Van-Zile's written testimony.  S.A. 21.  This evaluation of witness credibility is entitled to great deference on appeal.[2]  *King*

---

[2]  Mr. Martin argues that the arbitrator's credibility determination as to Mr. Van-Zile's written testimony is not afforded any deference because Mr. Van-Zile did not testify in person.  But the deference to credibility findings is not limited to live testimony.  *See Joseph v. Dep't of Homeland Security*, 497 F. App'x 26, 29 (Fed. Cir. 2012) (per curiam).  The arbitrator also found Mr. Martin to be a less than

*v. Dep't of Health & Hum. Servs.*, 133 F.3d 1450, 1453 (Fed. Cir. 1998).

Substantial evidence supports the arbitrator's finding as to these specifications. First, although Mr. Martin argues that the record does not show that he "grabbed" Mr. Van-Zile, Mr. Martin admitted to the deputies, on May 18, 2017, that he "grabbed" Mr. Van-Zile by the arm. S.A. 90. Next, it is undisputed that Mr. Martin instructed Mr. Van-Zile to sit in and shut off his car. S.A. 24. Mr. Martin argues, however, that his actions were warranted because Mr. Van-Zile was allegedly impaired by alcohol at the time. But the arbitrator noted evidence from the police report that Mr. Van-Zile "did not show any indication of being intoxicated." S.A. 191; *see also* S.A. 124–25 (Mr. Van-Zile stating that he had "a few beers" during lunch, roughly seven hours before the incident). As for the next specification, Mr. Martin denies requesting identification from Mr. Van-Zile, but Mr. Martin admitted to the deputies that he requested Mr. Van-Zile's identification. S.A. 90 ("Give me your ID."). Finally, it is undisputed that Mr. Martin reached into Mr. Van-Zile's car to turn the car off. *See* S.A. 287, 345. Mr. Martin again argues that his actions were warranted, but this argument fails given the arbitrator's finding that the evidence did not support Mr. Van-Zile's alleged intoxication. The arbitrator determined that Mr. Martin was not authorized to take any of these actions and exhibited "extremely poor judgment, especially for a law enforcement officer." *See* S.A. 24–26. Substantial evidence, therefore, supports the arbitrator's finding that Mr. Martin's behavior toward Mr. Van-Zile was conduct unbecoming a law enforcement officer.

Specification 8 involves Mr. Martin's interaction with Deputy Macioce, in which Mr. Martin suggested that he

---

credible witness based on, among other things, his "several versions" of the events of May 18, 2017. S.A. 21.

should have been given preferential treatment in a prior incident involving his stepdaughter, before body cameras were required. S.A. 27–28. Mr. Martin does not deny making the statements at issue, but he argues that his private conversation with Deputy Macioce cannot constitute actionable misconduct. We have held that "off-duty conduct that is inconsistent with the agency's mission and that undermines confidence in the employee can be sufficient to justify the employee's removal." *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1361 (Fed. Cir. 2000). Here, Field Office Director Adducci credibly testified that Mr. Martin's comment to Deputy Macioce indicated that "if you're not on a body camera, if you're not being watched, it would be okay to break the rules." S.A. 27–28; *see also* S.A. 49 ("[T]his was an exchange in which you chastised Deputy Macioce for not giving you preferential treatment, or discretion in your favor, because he could have done so without fear of repercussion since 'there were no body cameras back then.'"). Therefore, substantial evidence supports the arbitrator's finding that Mr. Martin's statements were unbecoming a law enforcement officer.

Specification 9 alleged that Mr. Martin refused to go back to his vehicle after being ordered to do so by one of the deputies approximately ten times. S.A. 28. The arbitrator's finding that Mr. Martin failed to obey this request is supported by body-camera video. *See* S.A. 152–54. Mr. Martin argues that he could not have taken the request seriously and, in any event, this incident was a wholly private conversation that cannot rise to actionable misconduct. The arbitrator found that the deputy's request was reasonable given the circumstances, *see* S.A. 28–29, and, as stated above, off-duty conduct can warrant removal, *see Brown*, 229 F.3d at 1361. Substantial evidence, therefore, supports the arbitrator's finding that Mr. Martin acted in a manner unbecoming a law enforcement officer.

2

To prove the charge of unauthorized use of a government database (Charge 2), it sufficed for the Agency to prove that Mr. Martin used a government database, NCIC, without authorization.[3] *See Sphatt v. Dep't of Homeland Security*, No. 2020-1451, 2021 WL 1291148, at *4 (Fed. Cir. Apr. 7, 2021); *Hernandez v. Dep't of Homeland Security*, 324 F. App'x 908, 910 (Fed. Cir. 2009) (per curiam); *see also* 5 C.F.R. § 2635.704(a). The arbitrator reasonably found that the Agency so proved.

Mr. Martin does not dispute that he logged into the NCIC database to search for records about Mr. Van-Zile; nor does he dispute that NCIC access is allowed only in connection with official duties. *See* S.A. 29. Instead, Mr. Martin argues that he was authorized to make the search because he reasonably believed Mr. Van-Zile may be the subject of a federal investigation for his alleged assault on Mr. Martin, a federal officer, after Mr. Martin was dragged by Mr. Van-Zile's car; Mr. Martin notes that, at the time he made the search, he "could have reasonably believed that [Assistant U.S. Attorney] McDonald would be handling the case." Martin Opening Br. at 19–20; *see also* S.A. 657–58 (Mr. Martin stating during the hearing that he spoke with Mr. McDonald, who "said I need to do whatever I can to identify [Mr. Van-Zile] so that we know who he is"). This argument fails: The Agency presented substantial evidence that Mr. Martin lacked authorization to use the database as he did and did not have reason to believe, after his conversation with Mr. McDonald, that any federal investigation would be opened into Mr. Van-Zile. According to an affidavit from Mr. McDonald, when asked if Mr. Van-Zile

---

[3] The arbitrator found the first specification (that Mr. Martin used the NCIC database) to be proven but found the second specification (that Mr. Martin used the TECS database) to be duplicative of the first. S.A. 29–31.

would be prosecuted, Mr. McDonald indicated to Mr. Martin that he "do[es] not make decisions on whether the U.S. Attorney's Office would accept a case for prosecution" and stated that he was "uncomfortable advising on a matter that [he] ha[d] not been assigned." S.A. 236. Moreover, when Mr. Martin spoke with his supervisor that evening, Mr. Martin did not request, nor was he given, permission to investigate the matter using agency databases. *See* S.A. 228–32.

The arbitrator's decision to uphold Charge 2, we conclude, is supported by substantial evidence.

3

As with Charge 2, to prove Charge 3 of unauthorized use of an agency resource, it sufficed for the Agency to prove that Mr. Martin used the resource, the CLEAR database, without authorization. *See Hernandez*, 324 F. App'x at 910; *see also* 5 C.F.R. § 2635.704(a).

Mr. Martin does not dispute that he ran Mr. Van-Zile's license plate through the CLEAR database on May 18, 2017, but he again argues that he was told to obtain information about Mr. Van-Zile for purposes of a potential federal prosecution. This argument fails for the reasons stated above. Mr. Martin also argues that he was given retroactive authorization to access the CLEAR database based on a May 19, 2017 email from an Assistant U.S. Attorney that told him to "prepare a detailed report of the incident on an official form." Pet. Appx. 104–05. The arbitrator considered and denied this argument, noting that "a reasonable law enforcement officer would have sought specific authorization to use these privileged databases" and that the email post-dated Mr. Martin's accessing of the CLEAR database. S.A. 32 n.16.

The arbitrator's upholding of Charge 3, we conclude, is supported by substantial evidence.

4

To sustain Charge 4 (lack of candor), it sufficed for the Agency to prove that Mr. Martin gave incorrect or incomplete information and did so knowingly. *Ludlum v. Dep't of Justice*, 278 F.3d 1280, 1284–85 (Fed. Cir. 2002). "Lack of candor" is "a broader and more flexible concept" than "falsification." *Id.* at 1284. "Although lack of candor necessarily involves an element of deception, 'intent to deceive' is not a separate element of that offense—as it is for 'falsification.'" *Id.* at 1284–85. The Agency alleged that Charge 4 was supported by four specifications, of which the arbitrator found Specifications 1, 3, and 4 to be proven, while finding Specification 2 to be duplicative of Specification 1. S.A. 32–36. Substantial evidence supports sustaining Charge 4.

The first specification relates to Mr. Martin's interview with the Agency's Office of Professional Responsibility, in which he testified that he never grabbed Mr. Van-Zile. S.A. 33–34; *see also* S.A. 246, 339. The arbitrator reasonably found that Mr. Martin was not candid in his interview when he stated only that he *guided* Mr. Van-Zile, despite telling Deputy Macioce on the evening of the incident that he "grabbed" Mr. Van-Zile. *Compare* S.A. 90 ("I grabbed him [Mr. Van-Zile] right by the arm and kind of, you know, a little come-along, you know, and I take him back to his car . . . ."), *with*, *e.g.*, S.A. 246 ("I just kind of put my arms and -- and guide him. I never physically grabbed him. I never dragged him. I didn't -- there was no force involved, it was, 'Come on, let's go to your car,' and I put my arms out and just kind of start walking, kind of corralled him towards his car, you know?"), S.A. 339 ("I never grabbed him. . . . I don't not recall ever grabbing ahold of him. The only thing I tried to grab -- I grabbed the steering wheel when I leaned in and I tried to grab the keys. If I -- if I touched him when he drove off, maybe. I don't know. It wasn't intentional. . . . I don't recall ever putting my hands on him. I turned him around, said, 'Let's go. We need to

go.'"). Although Mr. Martin argues on appeal that the arbitrator failed to distinguish between "touching," which he claims he admitted to during the interview, and "grabbing," the arbitrator's determination that Mr. Martin denied or gave incomplete answers in response to questions regarding his contact with Mr. Van-Zile—both touching and grabbing—is supported by substantial evidence. *See* S.A. 246, 339.

Specifications 3 and 4 relate to Mr. Martin's September 2017 complaint with the Macomb County Sheriff's Office, in which he claimed that he "ran the plate" of Mr. Van-Zile's vehicle and spoke with Mr. Van-Zile's spouse on May 18, 2017, as part of a "federal investigation that was underway." S.A. 35–36 (internal quotation marks omitted); *see also* S.A. 219–22 (complaint). Mr. Martin argues that he did not knowingly mislead the Sheriff's Office in his complaint because he reasonably believed at the time that he could pursue a federal investigation. This argument fails for similar reasons stated above: Based on his conversations with his supervisor and Mr. McDonald, Mr. Martin did not have reason to believe that he had authorization to pursue a federal investigation into Mr. Van-Zile. Moreover, an "intent to deceive" is not required to support a charge of lack of candor. *Ludlum*, 278 F.3d at 1284–85.

The arbitrator's upholding of Charge 4, we conclude, is supported by substantial evidence.

C

To sustain an adverse employment action based on improper conduct, an agency must establish not only that the charged conduct occurred, but also that it was sufficiently connected, *i.e.*, establish a nexus, to the efficiency of the government service, and that the penalty imposed was reasonable. *Hansen v. Dep't of Homeland Security*, 911 F.3d 1362, 1366 (Fed. Cir. 2018). Mr. Martin challenges the finding of sufficient nexus to the efficiency of service, but he does not argue that removal was an unreasonable

penalty.  *See* Martin Opening Br. at 17–19; *cf*. DHS Response Br. at 28.

The arbitrator found sufficient nexus to exist between the off-duty misconduct and the efficiency of the service. S.A. 18 n.14.  This finding is supported by Field Officer Adducci's credible testimony that Mr. Martin's actions, on and after May 18, 2017, resulted in his superiors losing trust in him to do his job as a law-enforcement officer.  *See* S.A. 715 ("Because of his lack of judgment, poor judgment he used in bringing his child into this dangerous situation, because he tried to curry favor from a law enforcement officer because of his position as a law enforcement officer, because he lied to [the Office of Professional Responsibility], because he lied to me, because he lied to the Macomb County Sheriff's Department, because he thinks it's okay to break the rules if you don't have a body camera.  He doesn't have honesty.  He doesn't have integrity.  I can't trust him, and he can't work for ICE." (internal quotation marks omitted)); *see also* S.A. 44.  The Board's determination to credit that testimony supports the nexus finding.  *See Brown*, 229 F.3d at 1358–59 ("Absent a mistake of law by the Board in selecting the proper test for analyzing the nexus requirement, which is not present here, we must uphold the Board's nexus finding if it is supported by substantial evidence.").

## III

For the foregoing reasons, we affirm the arbitrator's decision.

## **AFFIRMED**

### COSTS

The parties shall bear their own costs.