**Gamaliel ABAQUETA, M. D., Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. CV 00–2306–PHX–ROS.**

United States District Court, D. Arizona.

March 27, 2003.

Cheri McCracken, Esq, Phoenix, AZ, Daniel F Minahan, Jr., Minahan & Shapiro PC, Lakewood, CO, for Plaintiff.

John Charles Einstman, Denise Darcel Duprau, US Dept of Justice Commercial Litigation, Washington, DC, Richard Glenn Patrick, US Attorney's Office, Phoenix, AZ, for Defendants.

## ORDER

SILVER, District Judge.

Pending before the Court is Gamaliel Abaqueta's appeal from an administrative

decision of a Disciplinary Appeals Board of the United States Department of Veteran Affairs. Appellant filed a Brief on Appeal on Oct. 19, 2001 [Doc. # 31]. The government filed an Answering Brief on December 14, 2001 [Doc. # 36], and Appellant filed a Reply Brief on Jan. 1, 2002 [Doc. # 37]. Having reviewed the arguments and administrative record, the Court will uphold the decision of the Disciplinary Appeals Board and deny the Appeal.[1]

## I. Facts

Dr. Gamaliel Abaqueta ("Abaqueta" or "Appellant"), is an anesthesiologist previously employed by the Department of Veterans Affairs ("VA"). He worked at the VA Medical Center in Phoenix as an anesthesiologist from 1988 until March 11, 1999, when he was terminated for misconduct. Administrative Record ("A.R.") at 54, 138.

Abaqueta's termination stems from an incident that occurred on December 2, 1998. On that day, Abaqueta was assisting with the administration of anesthesia to a patient who was undergoing surgery to replace her silicone breast implants with saline implants. A.R. at 68. Before the operation and after the patient was anesthetized, Abaqueta was present as Dr. Simmonds and Dr. Reid, the two attending surgeons, discussed the medical success of the previous breast implant operation. A.R. at 392. Abaqueta observed them palpate the patient's breasts, then leave to scrub for surgery. A.R. at 141. At that point, while in the presence of two nurse anesthetists, Abaqueta palpated the patient's breasts. A.R. at 141. One of the nurses, Cynthia Holgate, verbally objected to Abaqueta's actions and Abaqueta left the operating room shortly thereafter. A.R. at 81–3. Both nurse anesthetists filed written reports on the incident and

Abaqueta was relieved of his duties the following day. A.R. at 527–529.

A Board of Investigation was convened to investigate the incident. The Board issued a report to the Medical Center Director, John Fears ("Fears"), on December 21, 1998. A.R. at 236. The Board concluded that Abaqueta "acted with unprofessional conduct" and was responsible for "patient abuse," an offense that required "no malice or intent to create harm to the patient." A.R. at 237–8. The Board recommended "appropriate administrative action be taken." A.R. at 238. Dr. William Dolan, Acting Chair of the Surgical Department, sent Abaqueta a letter on February 3, 1999 giving Abaqueta notice that his discharge was being considered. A.R. at 59. After summarizing the incident, the letter explained that Abaqueta could be discharged for "a violation of 5 CFR (Code of Federal Regulations) 735.203 which states that an employee shall not engage in conduct prejudicial to the government." A.R. at 59. Abaqueta was given an opportunity to respond to the notice, and he took the opportunity and met with Fears before a final decision was made. A.R. at 264.

On March 4, 1999, Fears issued a Memorandum explaining that Abaqueta would be discharged, and explaining that the "[r]easons .... stated in the notice of proposed discharge are sustained." A.R. at 54. Furthermore, Fears explained that he considered a number of factors in determining the proper penalty before concluding that discharge would be "appropriate and within the range of reasonableness." A.R. at 54. Abaqueta appealed the decision to a VA Disciplinary Appeals Board ("Appeals Board"), which heard testimony and evidence on Abaqueta's termination and upheld the decision on December 30, 1999. A.R. at 15.

---

1. The Administrative Record will be abbreviated as "A.R."

Although Abaqueta testified that he palpated the patient's breasts out of "medical interest" and his "own clinical interest," the Appeals Board concluded that "the Appellant touched the patient's breast because he was curious and wanted the feel the implant. His manner of touching by rotating from one breast to another did not constitute a medical examination of the patient." A.R. at 12, 156. The Appeals Board upheld the penalty agreeing that it was a violation of 5 C.F.R. § 735.203, which prohibits employee conduct prejudicial to the government. A.R. at 13. The Appeals Board also noted that Fears "testified he made his decision based on the evidence of record and the fact that he questioned several prominent anesthesiologists concerning whether the Appellant's action constituted appropriate behavior." A.R. at 13.

## II. Discussion

### A. Whether Abaqueta Engaged in Professional Misconduct

The Court has jurisdiction to review the decision of a Disciplinary Appeals Board for the Veterans Health Administration under 38 U.S.C. § 7462(f), and in particular § 7462(f)(2), which reads,

the court shall review the record hold unlawful and set aside any agency action, finding or conclusion found to be -

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) obtained without procedures required by law, rule, or regulation having been followed; or

(C) unsupported by substantial evidence.

■ "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct

a verdict...." *Jackson v. Veterans Admin.*, 768 F.2d 1325, 1329 (Fed.Cir.1985) (quotations and citations omitted). The Court's standard of review of decisions of the Department of Veterans Affairs mirrors the standards for judicial review of other administrative actions, and analogous administrative law precedents are applicable. *See Dick v. Department of Veterans Affairs*, 83 M.S.P.R. 464, 465–6 (1999) (explaining parallel review system for health care professionals within the Department of Veterans Affairs); *Ward v. Brown*, 22 F.3d 516, 521–2 (2nd Cir.1994) (discussing standard of review and applying precedents from other administrative review proceedings).

Abaqueta contends that the Appeals Board was erroneous in concluding that his actions constituted unprofessional misconduct. He has three interrelated arguments. First, he argues that there was not substantial evidence to support a finding that his act of palpating the patient's breasts was unprofessional misconduct. Second, he argues that his actions cannot be punished as "conduct prejudicial to the government." Third, he contends that Fears relied on forbidden *ex parte* communications in deciding that his actions constituted professional misconduct.

■ First regarding the issue of whether there was substantial evidence that he engaged in unprofessional misconduct, Abaqueta points to conflicting testimony concerning his palpating the patient's breasts. The Court finds that the VA Medical Center presented more than "substantial evidence" that Abaqueta's actions constituted clear ethical violations. *Jackson*, 768 F.2d at 1329.

Expert testimony before the Appeals Board was given by Dr. Judith Fabian, a recently retired anesthesiologist and professor of ethics. She testified unequivocal-

ly as follows that Abaqueta's actions were "inappropriate."

> [Fabian]: There was no medical necessity for Dr. Abaqueta to squeeze the patient's breasts. It had nothing to do with the conduct of anesthesia in any way, shape, or form....
>
> Q: .... What about an assertion by Dr. Abaqueta that he was trying to further his clinical knowledge?
>
> A: I don't think there's any sort of clinical knowledge that he could gain from palpating the patient's breasts. There wasn't any lesson in pathology to be learned.... As an anesthesiologist he had no reason to have to know about breast implants or what they feel like. It has nothing to do with our specialty.

A.R. at 105–6.

Relying on the American Society of Anesthesiologists' Guidelines for the Ethical Practice of Anesthesiology ("ASA Guidelines"), Dr. Fabian further testified:

> We as anesthesiologists remove the patients' ability to speak or act for themselves. We render them unconscious, and so it's incumbent upon us to respect their dignity and their rights and to do everything in our power to see that everyone else in the operating room does the same. I believe Dr. Abaqueta's actions were in violation of this patient's dignity. I don't believe that he would have gone up to her and squeezed her breasts had she been awake, but she wasn't awake, she was asleep, and she was unable to speak for herself.

A.R. at 106.[2] In response, Abaqueta presented the testimony of Dr. Carl Nau, who spent twenty-two years as chairman of the anesthesia department at Good Samaritan Medical Center in Phoenix. Dr. Nau testified:

> I don't think it's inappropriate at all for a doctor to examine a patient. And that question is why, why was this done, and I think that even if it was just a matter of medical interest, that that's not an inappropriate act. As a matter of fact, I know that many anesthesiologists examine a patient to determine, you know, just what the pathology is, even though that does not necessarily have anything to do with the—to change your anesthetic plan.... But it's certainly not uncommon for an anesthesiologist to examine the pathology for which the surgery is proposed.

A.R. at 113–4. Dr. Nau's testimony leaves looming many unanswered questions. If the palpation was an unnecessary medical procedure, what *medical* knowledge or information did Abaqueta reasonably anticipate he would gain from the palpation? Second, assuming that he would have gleaned some medical information from the palpation, was it crucial that he acquire this education at the exact time and by the particular mode he chose? Clearly, if the timing and mode of Abaqueta's search for this vital medical knowledge was not imperative, he was obligated to secure her permission before invading the fundamental intimacy of her body. It is self-evident to the Court that the patient would not have freely given her consent, because the record is bereft of her testimony that she would have agreed to Abaqueta's palpation procedure in the interest of advancing the laudable pursuit of medical knowledge.

█ Even in the face of conflicting testimony, the Appeals Board had substantial evidence to conclude that Abaqueta's act of palpating the patient's breasts was unprofessional misconduct. The Appeals Board's decision relied in part on the ASA

---

**2.** Dr. Fabian clarified that she "didn't gather that there was any sexual intent," but that "it was just rather callous." A.R. at 111.

Guidelines and in part on evaluation of witness credibility. The ethical standard was a question of fact for the Appeals Board to determine based on the qualification and testimony of the expert witnesses. For example, on cross-examination, counsel for the government questioned whether Dr. Nau, who received his medical training in the mid–1950s, still could provide an accurate assessment of contemporary attitudes toward patients' rights and expectations while anesthetized. A.R. at 116. "[G]reat deference must be granted to the trier of fact who has had the opportunity to observe the demeanor of the witnesses." *Jackson,* 768 F.2d at 1331; *see also Brown v. United States Postal Serv.,* 860 F.2d 884, 887 (9th Cir.1988) (determination of credibility of witnesses within discretion of presiding official). The Appeals Board was in the best position to resolve the question of the applicable standard of professional conduct. Its determination was supported by substantial evidence in the record, and the Court will not second-guess the findings of the Appeals Board. *See Brown,* 860 F.2d at 887 ("We may not displace an agency's decision 'between two fairly conflicting views even [if] the court would justifiably have made a different choice had the matter been before it *de novo.*' ") (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

██ Abaqueta also suggests that any allegation of professional misconduct is too vague to constitute "conduct prejudicial to the government." He relies, in part, on *Holland v. Department of Air Force,* 31 F.3d 1118 (Fed.Cir.1994), a case in which the Court overturned an employee's punishment for allegedly gender-biased statements. In *Holland,* the Federal Circuit held that the employee's particular statements were not proscribed by the statute under which the employee was punished, which tracked Title VII of the Civil Rights Act of 1964. *Holland,* 31 F.3d at 1120–1.

While complaining that the government's interpretation of its own regulation was "so vague as to cover everything and touch nothing," *Id.* at 1121, the Court clarified that biased statements were not discriminatory acts under the terms of the statute. The holding in *Holland* is limited to the interpretation of a particular statute that is not at issue in this case.

██ In contrast, violations of professional conduct and intentional violations of the dignity of a patient easily and reasonably fall within the category of "conduct prejudicial to the government." The VA Medical Center has a number of regulations proscribing patient abuse and mandating respect for the dignity of a patient. *See* A.R. at 554, 565, 567, 595, 596, 599. Moreover, the government can discipline employees for particular instances of misconduct under broadly-phrased regulations. In *Brown v. Department of Navy,* 229 F.3d 1356, 1358–59 (Fed.Cir.2000), the Court upheld the removal of an employee for having an affair with a soldier's wife under a general mandate to improve "efficiency of the service." The Court noted that "[t]he fact that there may be no direct precedent for the action taken in a particular case does not, however, prohibit the agency from taking adverse action if it is consistent with general principles of federal employment law." *Brown,* 229 F.3d at 1363. *See also Jones v. City of Chicago,* 787 F.2d 200, 206–7 (7th Cir.1986) ("Whatever the prevailing community medical standard ... a physician knows ... that his conduct must not exceed the bounds of his oath and ethical obligations."); *Gipson v. Veterans Admin.,* 682 F.2d 1004, 1009 (D.C.Cir.1982) ("[The former employee] could therefore be subject to discipline, even though his actions may have violated no specific hospital regulation.").

██ Next, Abaqueta contends that the decision should be overturned because

Fears relied on *ex parte* contacts with experts in the field of anesthesiology who expressed their opinion that Abaqueta's conduct was a violation of professional standards. Abaqueta claims that he was unable to identify or cross-examine those undisclosed experts, and therefore he was denied his due process rights.

In *Stone v. Federal Deposit Ins. Corp.*, 179 F.3d 1368 (Fed.Cir.1999), the Federal Circuit held that "[t]he introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice ... and the opportunity to respond.... It is constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process." *Stone*, 179 F.3d at 1376. In *Stone*, the "deciding official" who made the ultimate termination decision received *ex parte* memoranda from other officials urging that the appellant be terminated. Because the appellant had no opportunity to respond to this information, he was denied due process rights in his property interest of continued federal employment. *Stone*, 179 F.3d at 1375.

■ *Stone*, however, clarified that "not every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee...." 179 F.3d at 1376–77. On the contrary, "[o]nly new and material information to the deciding official will violate the due process guarantee of notice." 179 F.3d at 1377. *Stone* provides a number of factors to be considered in making this determination:

> whether the *ex parte* communication merely introduces 'cumulative' information; whether the employee knew of the error and had a chance to respond to it; and whether the *ex parte* communications were of the type likely to result in

undue pressure upon the deciding official to rule in a particular manner. Ultimately, the inquiry .... is *whether the ex parte communication is so substantial and so likely to cause prejudice* that no employee can fairly be required to be subjected to a deprivation of property under such circumstances.

*Stone*, 179 F.3d at 1377 (emphasis added). The Federal Circuit held that cumulative evidence does not constitute "new and material" evidence. "When a deciding official initiates *ex parte* communication that only confirms or clarifies information already contained in the record, there is no due process violation." *Blank v. Department of Army*, 247 F.3d 1225 (Fed.Cir.2001).

Under the holdings of *Stone* and *Blank*, Abaqueta's due process rights were not violated. Any information that Fears received from undisclosed anesthesiologists was duplicative of information already available in the record. Fears testified that he relied upon the ASA Guidelines, which provide standards for an anesthesiologist maintaining the dignity of the patient while unconscious. A.R. at 14. Fears's interpretation of those Guidelines is consistent with the interpretation testified to by Dr. Fabian. The Appeals Board had access to both the Guidelines and the detailed testimony of Dr. Fabian. A.R. at 91.

Furthermore, counsel for the government at the Appeals Board hearing clarified that Dr. Fabian's testimony was duplicative of any information Fears may have received from other anesthesiologists. A.R. at 103. Thus, contacts with anesthesiologists only corroborated Fears's decision based on a reliance on the ASA Guidelines and the testimony of Dr. Fabian. Abaqueta was given the opportunity and did present an alternative interpretation of the ethical rules, both to Fears before the March decision, and before the Appeals

Board through the expert testimony of Dr. Nau, and he was able to and did cross-examine both Fears and Dr. Fabian. Therefore, Abaqueta had a specific and adequate opportunity to respond to the information. Overall, the *ex parte* contacts were not "so substantial and so likely to cause prejudice" that Abaqueta could not fairly be terminated based on the evidence supporting termination. *Stone,* 179 F.3d at 1377.

Finally, the Court notes that the Appeals Board concluded that Abaqueta's actions "did not constitute a medical examination of the patient," because it found that he was motivated by personal and not medical curiosity, and this finding is supported by substantial evidence. This decision was not based on the testimony of other anesthesiologists. The Appeals Board therefore determined that Abaqueta violated standards of professional conduct and engaged in conduct prejudicial to the government, and, the Court concludes there is no abuse of discretion.

### B. Whether the Penalty was Excessive

■ Abaqueta next argues that the Appeals Board's penalty of removal was grossly excessive such that it was arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence. This argument is also unpersuasive.

■ "We defer to the board's judgment unless the penalty is so harsh or disproportionate to the offense as to constitute an abuse of discretion." *McClaskey v. United States Dep't of Energy,* 720 F.2d 583, 586 (9th Cir.1983). The Ninth Circuit has "found the penalty of dismissal to be excessively harsh only when the offense committed was extremely minor." *Id. See also Morales v. Merit System Protection Board,* 932 F.2d 800, 802 (9th Cir. 1991) ("Dismissal is harsh to this degree

[of abuse of discretion] only when the offense committed is minor.").

■ The Court must examine the severity of the penalty in light of factors such as "the range of permissible punishment specified by statute or regulation, the disciplined party's job level and nature, his record of past performance, the connection between his job and improper conduct charges, and the strength of the proof that the conduct occurred." *Brown,* 860 F.2d at 888 (quoting *Brewer v. United States Postal Serv.,* 227 Ct.Cl. 276, 647 F.2d 1093, 1098 (1981)). The Court's "review of an agency-imposed penalty is essentially to assure that the agency did conscientiously consider the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." *Douglas v. Veterans Admin.,* 5 MSPB 313, 332–3, 5 M.S.P.R. 280 (1981). *Douglas* lists twelve factors that courts and review boards should use to determine whether a penalty is appropriate. 5 M.S.P.B. at 332, 5 M.S.P.R. 280. "The board is not required to consider all twelve factors in every case; it need only consider those relevant to the individual case." *McClaskey,* 720 F.2d at 583. *See also Douglas,* 5 M.S.P.B. at 332, 5 M.S.P.R. 280 ("Not all of these factors will be pertinent in every case, and .... [s]election of an appropriate penalty must thus involve a responsible balancing of the relevant factors in the individual case.").

Abaqueta argues that the Appeals Board's penalty was arbitrary and capricious because it failed to consider the sixth *Douglas* factor, "consistency of the penalty with those imposed upon other employees for the same or similar offenses." *Douglas,* 5 MSPB at 332, 5 M.S.P.R. 280. *See Ward v. Brown,* 22 F.3d 516, 521–2 (2d Cir.1994) (VA should apply a policy of similar penalties for similar offenses). Abaqueta contends that certain other employees were punished less harshly for

similar acts. In particular, he points to about thirteen cases over a five-year period where the hospital was alleged to commit or admitted committing medical malpractice.[3] Fears acknowledged during the Appeals Board hearing that no employee was fired or suspended for these prior incidents of negligence. A.R. at 95.

"To make out a claim of disparate treatment the charges and the circumstances surrounding the charged behavior must be substantially similar." *Archuleta v. Department of Air Force*, 16 M.S.P.R. 404, 406 (1983). The government argues that the malpractice cases and Abaqueta's case are not substantially similar primarily because the former involves negligence and the latter involves an intentional act.[4] The government contends that the hospital might employ other remedies to solve the problems of medical negligence (i.e., transfer, training),[5] but an issue of intentional and repetitive behavior presents a narrower range of solutions. Indeed, the Appeals Board considered Abaqueta's situation to be unique. Fears testified that he made his decision to terminate in part on "past behavior, his refusal to admit that he had a problem, that he *did anything wrong*" A.R. at 91, *see also* A.R. at 101–2. The Appeals Board, engaging in the task of reviewing credibility determinations, cited to testimo-ny indicating that Abaqueta might commit further indiscretions toward patients in the future. A.R. at 14. Finally, Abaqueta provides no reliable factual evidence of the negligent acts upon which the Appeals Board could have made or the Court can make a more detailed comparison.[6] Abaqueta has not shown that the circumstances of his dismissal were substantially similar to the malpractice incidents such that his penalty was arbitrary or capricious.

Next, Abaqueta contends that the Board failed to examine any mitigating factors that would counsel against dismissal, while improperly considering Abaqueta's past disciplinary record as an aggravating factor. The Appeals Board, however, considered Abaqueta's background and work record at the hospital, and further noted that it had considered mitigating factors. A.R. at 9, 13. Significantly, the Board did not find a potential for Abaqueta's personal improvement, but rather cited evidence that Abaqueta indicated that "if he were returned to duty, he would touch a patient's breast again." A.R. at 14.

As an aggravating factor, the Appeals Board considered that Abaqueta was previously suspended for refusing to respond to a medical request while on call. *See*

---

3. At some point before the incident, Abaqueta made complaints of patient abuse and negligence that were eventually incorporated into a letter sent from Medical Inspector James McManus to Senator John McCain. A.R. at 178–181. Fears testified that he had no knowledge of that letter until after Abaqueta's termination and that Abaqueta's allegations had no effect on his decision. A.R. at 98–9. The Board did not find that Abaqueta's termination was related to his prior complaints, A.R. at 12, and Abaqueta does not raise issues of retaliation.

4. Dr. Jurado, the Chairperson of the Review Board, indicated this analysis at the hearing: "I think that I agree with Mr. Fears, that if something is by negligence or by intent, that

is apples and oranges, and I would say that you couldn't compare the sanctions that come from those two actions." A.R. at 97.

5. Fears testified that the incidents of medical negligence had undergone peer review, and that "[a]ppropriate action was taken because of the mistakes. They're the kinds of things that you don't really discipline people over, because they are just that, mistakes, completely different than the thing with Dr. Abaqueta." A.R. at 97.

6. The Board also notes that "no specific dates or descriptions of incidents or testimony was [sic] presented for the Board's consideration." A.R. at 13.

*Douglas,* 5 MSPB at 332, 5 M.S.P.R. 280 (third factor for court to consider is "employee's past disciplinary record"). Fears testified that the two issues were related: "I think the thing that disturbed me is the attitude. It's not very patient oriented. It's a very self-centered attitude. I'm the doctor. I'm right. I don't care about the patient." A.R. at 92. Both Fears and the Appeals Board considered this previous suspension to be an aggravating factor supporting Abaqueta's dismissal. A.R. at 14. Though Abaqueta now maintains that the two disciplinary issues are not related, Fears' explanation provides at least substantial evidence of an ongoing behavioral and unprofessional problem. *Cf. Skates v. Department of Army,* 69 M.S.P.R. 366, 369 (1996) (five-year suspension for shoving match not sufficiently related to stealing leftover food to be considered as an aggravating factor).

The Appeals Board considered the relevant *Douglas* factors, in addition to addressing whether the VA Manual recommended a particular penalty. A.R. at 13. The penalty was not harsh or disproportionate to the offense, and the intentional violation of a patient's dignity unequivocaly related directly to Abaqueta's job duties. The Appeals Board "conscientiously consider[ed] the relevant factors" and came to a conclusion clearly within the tolerable limits of reasonableness. *Douglas,* 5 M.S.P.B. at 332–3, 5 M.S.P.R. 280. Therefore, the Appeals Board's decision was not arbitrary, capricious, an abuse of discretion, or lacking substantial evidence.

Accordingly,

**IT IS ORDERED** that the decision of the Disciplinary Appeals Board is **AFFIRMED.**